UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

05 - 1 1 7 7 8 DPW

MARNIE J. AMARAL D/B/A )
M & E MOBIL )
 )
        Plaintiff )                                    C.A. NO.:
 )
 )
        v. )    MAGISTRATE JUDGE Alexander    RECEIPT # 66533
 )                                              AMOUNT $ 250
DRAKE PETROLEUM COMPANY, INC. )                 SUMMONS ISSUED N/A
 )                                              LOCAL RULE 4.1
        Defendant. )                            WAIVER FORM
 )                                              MCF ISSUED
                                                BY DPTY. CLK.
                                                DATE

## DEFENDANT'S NOTICE OF REMOVAL OF CAUSE TO UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

In support of this petition, petitioner, Drake Petroleum Company, Inc., respectfully shows the following.

1.      Petitioner, Drake Petroleum Company, Inc., is the defendant in the above entitled action.

2.      The above entitled action was commenced in the Superior Court for the County of Bristol, in the Commonwealth of Massachusetts and is now pending before that court.  On August 17, 2005, Plaintiff served Defense Counsel with an Amended Complaint setting forth a new claim under 15 U.S.C. §2801 et seq., the Petroleum Marketing Practices Act (PMPA).

3.      This action is now a civil action of which this court has original jurisdiction under 28 U.S.C.. §1331, and is one that the defendant is entitled to remove to this court pursuant to 28 U.S.C. § 1446, in that the plaintiff is claiming a cause of action under 15 U.S.C. §2801 et seq.

4.      Defendant attaches copies of all process, pleadings, and orders served in this action to this Notice.

Wherefore, Defendant prays that this Honorable Court remove the above action now pending against it in the Superior Court for the County of Bristol, in the Commonwealth of Massachusetts, Docket No. BRCV2004-01354-C, from state court to this Court.

Petitioner/Defendant,
Drake Petroleum Company, Inc.
By Its Attorney

Brian A. O'Connell (BBO # 551182)
Zizik, Powers, O'Connell, Spaulding
& Lamontagne, P.C.
One Hollis Street, Suite 400
Wellesley, MA 02482
(781) 263-0202

## CERTIFICATE OF SERVICE

I, Laura K. Peltonen, hereby certify that on this _____ day of August, 2005, I served a copy of the foregoing on all parties to this action by mailing same, postage prepaid, to all counsel of record.

Laura K. Peltonen

2

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARNIE J. AMARAL D/B/A )<br>M & E MOBIL )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>DRAKE PETROLEUM COMPANY, INC. )<br>)<br>Defendant. )<br>) | C.A. NO.: |

## AFFIDAVIT OF FILING OF COPY
## OF NOTICE OF REMOVAL

I, Laura Peltonen, on oath depose and say that on August 24, 2005, I filed a copy of the

Notice of Removal in the above matter with the Clerk of the Bristol Superior Court, Bristol

County, Massachusetts.

Signed under the pains and penalties of perjury this 24th day of August, 2005.

Laura K. Peltonen

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
BRISTOL DIVISION
CIVIL ACTION NO. BRCV2004-
01354-C

MARNIE J. AMARAL d/b/a M & E MOBIL

Plaintiff,

v.

FIRST AMENDED COMPLAINT

DRAKE PETROLEUM COMPANY, INC.

Defendant

## NATURE AND BASIS OF ACTION

1. This is an action by a gasoline service station dealer against her supplier and
lessor for breach of contract, breach of the implied covenant of good faith and fair dealing,
fraudulent misrepresentation, breach of the open price provision of the Uniform Commercial
Code, M.G.L. c.106, §2-305(2), unfair and deceptive trade practices in violation of M.G.L.
c.93A, §11, and wrongful non-renewal under the Petroleum Marketing Practices Act, 15 U.S.C.
§2801 et. seq.

## PARTIES

2. Plaintiff Marnie J. Amaral ("Ms. Amaral") lives in New Bedford, Bristol County,
Massachusetts. Since 1988, she has operated a Mobil-brand gasoline station and convenience
store on property located at 408 Rhode Island Avenue in Fall River ("Marketing Premises" or
"the Station"). At all times relevant to this action, Ms. Amaral has been both a "franchisee" and

"retailer" within the meaning of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801(4) and (7)("PMPA"), respectively.

3.     Defendant Drake Petroleum Company, Inc. ("Drake") is a Massachusetts corporation with a principal place of business at 221 Quinebaug Road, North Grosvenordale, Connecticut. Drake is one of the largest independent distributors of gasoline and diesel in New England. Among the major brands Drake distributes are Mobil, Texaco, Sunoco, Citgo, Gulf, Getty and Exxon. At all times relevant to this action, Drake has been both a "franchisor" and "distributor" within the meaning of Sections 2801(3) and (6) of the PMPA, respectively. It is not a "refiner" within the meaning of Section 2801(5) of the PMPA.

### FACTUAL ALLEGATIONS

4.     At all times relevant to this action, Mobil Oil Corporation ("Mobil") has been a "refiner" within the meaning of Section 2801(5) of the PMPA.

5.     In 1988, Ms. Amaral and Mobil entered into a written contract establishing a "franchise" and "franchise relationship" within the meaning of Section 2801(1) (A), (B)(i), (ii), and (2) of the PMPA.

6.     In October 1990, Ms. Amaral and Mobil extended their franchise relationship for an additional three –year term ending November 30, 1993.

7.     In or about June 1993, Mobil sent Ms. Amaral a letter stating that, effective December 1, 1993, she would begin receiving a $1,500 monthly rent credit for operating the Station on a 24-hour basis ("24-hour rent credit"). Mobil indicated that she would continue to receive the 24-hour rent credit unless and until it was withdrawn by Mobil on 90 days' written notice.

8.     By letter dated June 15, 1993, Mobil notified Ms. Amaral that, effective December 1, 1993, her rent would be reduced by five cents for every gallon of gasoline she

2

purchased from Mobil ("Rent Reduction Letter"). The letter indicated Ms. Amaral would

continue to receive the credit unless and until it was withdrawn by Mobil on 90 days' written

notice. A true and correct copy of the Rent Reduction Letter is attached as **Exhibit A**.

9.      On or about October 22, 1993, Ms. Amaral and Mobil extended their franchise

relationship for an additional three-year term ending November 30, 1996 ("1993 PMPA

Franchise Agreement"). A true and correct copy of the 1993 PMPA Franchise Agreement is

attached as **Exhibit B**.

10.     Under Article II, Paragraph A of the 1993 PMPA Franchise Agreement, Ms.

Amaral was obligated to purchase from Mobil a minimum of 95,258 gallons per month and

1,143,100 gallons per year.

11.     Under Article II, Paragraph B of the 1993 PMPA Franchise Agreement, Mobil

agreed to charge Ms. Amaral "prices [for motor fuel] in effect at time and place of delivery for

that class of customer in which [Ms. Amaral] shall then fall, as determined by Mobil."

12.     Among other things, Article III, Paragraph D(1) of the 1993 PMPA Franchise

Agreement (as amended by letter agreement dated October 18, 1993, a true correct copy of

which is attached as **Exhibit C**) provided:

>       (a)     for a nominal rent in years one to three of the contract of $110,300,
>               $113,300 and $116,330 respectively;
>
>       (b)     for collection of such rent on a "cents per gallon basis in such amount as
>               determined by Mobil, upon delivery of each gallon of any motor fuel" to
>               the Marketing Premises ("gallonage collection program"); and
>
>       (c)     In the event "in any month ... the amount of rent collected [was] less than
>               the rent due for the month," for Ms. Amaral to pay the deficiency to Mobil
>               no later than the fifteenth day of the following month.

13.     Under Article III, Paragraph E of the 1993 PMPA Franchise Agreement, Mobil

offered Ms. Amaral "the opportunity to participate in one or more rental reduction programs

3

under which Dealer may pay a rental less than the contract rent specified in Paragraph D above," but reserved the "right to withdraw or modify any rental reduction program at any time [on] ... 90 days' advance written notice."

14.     On August 17, 1995, Drake entered into a written Distributor Agreement with Mobil authorizing Drake to purchase Mobil-brand motor fuel at wholesale (i.e. "rack") prices, and use Mobil's trademark in connection with the sale and distribution of such branded product at retail outlets operated by Drake employees, agents, licensees or affiliated companies, and to retail locations leased to Mobil-franchise dealers.

15.     At the same time, Drake purchased the Station from Mobil and took an assignment from Mobil of its rights and obligations under the 1993 PMPA Franchise Agreement, including Mobil's obligations as franchisor under the PMPA and its obligations under the Rent Reduction and 24-Hour Rent Letters.

16.     From August 17, 1995 to November 6, 1997, Ms. Amaral operated the Station pursuant to the 1993 PMPA Franchise Agreement assigned to Drake. Since that time, her franchise and franchise relationship with Drake have been extended twice, first by agreement dated November 6, 1997, and subsequently by agreement dated May 11, 2000 ("2000 PMPA Franchise Agreement"). Both incorporated, except as otherwise stated, the terms of the 1993 PMPA Franchise Agreement, including without limitation the pricing (Article II, Paragraph B) and rental reduction (Article III, Paragraph III) provisions. A true and correct copy of the 2000 PMPA Franchise Agreement is attached as **Exhibit D**.

17.     Like the 1993 and 1997 PMPA Franchise Agreements, the 2000 PMPA Franchise Agreement constitutes a "franchise" and establishes a "franchise relationship" within the meaning of Sections 2801(1) (A), (B) and (2) of the PMPA respectively.

4

18. Since September 1995, Drake has issued Ms. Amaral invoices on the first day of each month for the full amount of the rent specified in the 1993, 1997 and 2000 PMPA Franchise Agreements. At the beginning of the following month, Drake has mailed Ms. Amaral Rent Calculation Worksheets reflecting: (a) the full contract rent for the previous month, (b) the $1,500.00 24-hour rent credit, (c) the five cents per gallon rent credit, (d) the net rent due for the month after deducting the rent credits, (e) the amount of rent already received by Drake under the gallonage collection program (2.3 cents times monthly motor fuel purchases), and (f) the net rent deficiency to be drafted via electronic funds transfer from Ms. Amaral's business checking account on the fifteenth day of the month. True and correct copies of representative monthly rent invoices and Rent Calculation Worksheets are attached as **Exhibits E** and **F** respectively.

19. Based on the Rent Calculation Worksheets, Drake has drafted the net rent deficiency from Ms. Amaral's business checking account on the fifteenth day of each month.

20. Ms. Amaral reasonably relied on the Rent Calculation Worksheets as setting forth the full amount of her rent obligation.

21. On November 30, 2002, the 2000 PMPA Franchise Agreement expired but was extended pursuant to Article III, Section K of the 1993 PMPA Franchise Agreement.

22. In March 2004, Drake offered Ms. Amaral a separate Lease and Dealer Sales Contract, true and correct copies of which are attached as **Exhibits G** ("March Lease") and **H** ("March Dealer Sales Contract") respectively.

23. Among other things, the March Lease proposed to:

a. Lease to Ms. Amaral the *portion* of the Marketing Premises devoted to the operation of a convenience grocery store ("Leased Premises"), but *not* the portion devoted to the sale of motor fuel, including the pumps and underground storage tanks ("Adjacent Property"). March Lease, Preamble and ¶¶ 2, 35;

5

b.  Reserve to Drake the right to operate a "motor fuels dispensing operation" on the Adjacent Property ("Motor Fuels Operation"). Id., ¶35;

c.  Reserve to Drake the right during the term of the Lease, for any reason whatsoever, to "enter upon, remain on, and exit from the Leased Premises for the purpose of taking any actions [Drake] deemed necessary or appropriate in connection with the conduct of the Motor Fuels Operation, including without limitation, installing and operating cash registers or computer consoles, and *depositing, withdrawing, and monitoring* receipts from sales from the Motor Fuels Operation. ..." Id. (emphasis supplied);

d.  Allow Ms. Amaral to "supervise the actual conduct" of the Motor Fuels Operation "so long as [she was] performing services with respect to the Motor Fuels Operation under the terms of the Dealer Sales Contract." Id.;

e.  Permit Drake "in the future [to] conduct the Motor Fuels Operation *without any participation by [Ms. Amaral]*," in which event Ms. Amaral would be required to operate the convenience store business in such a fashion as to not interfere with the Motor Fuels Operation, and Drake would have the right to install and maintain within the Leased Premises "*a separate cash register* for [Drake]'s cash and other receipts from sales from the Motor Fuels Operation. ..." Id. (emphasis supplied);

f.  Grant Drake the option to sell branded motor fuel for its own account on the Adjacent Property "subject to the terms and conditions of a franchise agreement with its branded supplier of motor fuels," in which case Ms. Amaral would be required to "comply with all requirements relating to the operation of the [Convenience Store] Business imposed upon [Drake] by its franchisor." Id., ¶36;

g.  Charge rent in the first year of $13,500 per month, an amount 23% more than the rent stated in the 2000 PMPA Franchise Agreement and approximately 250% more than the net monthly rent Ms. Amaral has been paying under that agreement after deduction of the 24-hour and volume rent credits. Id., ¶3(a);

h.  Discontinue all rent reduction programs, including the 24-hour and volume rent credits;

i.  Discontinue the gallonage collection program, requiring instead that Ms. Amaral pay the full monthly contract rent *in advance* on or before the first day of each month. Id.;

j.  Require Ms. Amaral, despite the fact that she was leasing only the convenience store building, to pay one hundred percent of the $17,000 annual real estate tax bill for the entire Property, taxes which had

6

previously been paid entirely by Drake and included in the rent. <u>Id.</u>, ¶¶ 4, 6;

k.    Allow Drake to terminate the Lease in the event the Leased Premises were so damaged or destroyed by fire or other casualty that such damage could not be repaired within 60 days, without being obligated, in the event the Station was subsequently rebuilt, to grant Ms. Amaral a right of first refusal of any franchise under which such premises were to be operated. <u>Id.</u>, ¶9;

l.    Permit Drake to retain the entire proceeds received in the event all or part of the Leased Premises were taken by eminent domain, without being obligated to fairly apportion between Drake and Ms. Amaral the compensation, if any, received by Drake from the awarding authority based on any loss of business opportunity or good will. <u>Id.</u>, ¶ 10;

m.    Permit Drake to terminate the Lease for failure to operate the convenience store on the Leased Premises for more than twenty-four (24) consecutive hours or forty-eight (48) hours during any twelve month period. <u>Id.</u>, ¶17(a)(vii);

n.    Allow Drake, in the event of a default by Ms. Amaral, to immediately terminate the Lease without notice and immediately regain possession of the Leased Premises. <u>Id.</u>, ¶17(b); and

o.    Require Ms. Amaral, on the last day of the term of the Lease, or upon earlier termination, to surrender possession of the Leased Premises to Drake. <u>Id.</u>, ¶19.

24.    Absent from the proposed March Lease are any references to Drake's Distributor Agreement with Mobil, or any provisions continuing Ms. Amaral's Mobil franchise, including the right to (a) use and occupy the portion of the Marketing Premises used in connection with the sale and distribution of Mobil-brand motor fuel under Mobil's trademarks, including the pumps and underground storage tanks; and (b) use Mobil's trademarks in connection with the sale and distribution of Mobil-brand motor fuel.

25.    Among other things, the March Dealer Sales Contract proposed to:

a.    Require Ms. Amaral to purchase from Drake "gasoline and/or any other motor fuels of all kinds, grades, *brands* and quality being sold by" Drake at the time of delivery. March Dealer Sales Contract, ¶1 (emphasis supplied);

7

    b.    Permit termination by Drake on the basis of a failure by Ms. Amaral to meet unspecified monthly or annual minimum product purchase requirements. Id., ¶¶ 3, 7(f);

    c.    Permit termination by Drake, in the event of default by Ms. Amaral, on 10 days written notice, reduced to 5 days for any default based on failure to pay sums due and owing. Id., ¶8;

    d.    Reserve to Drake "the right without prior notice to change, *abolish*, remove, substitute, or alter any of" the trademarks adopted and used by Drake in its business. Id., ¶12 (emphasis supplied); and

    e.    Establish a three-month contractual statute of limitations within Ms. Amaral would be required to institute suit based on a claim arising out of the Dealer Sales Contract. Id., ¶13.

26.    Despite the fact that Drake has not suffered the loss of the right to authorize Ms. Amaral to use the Mobil trademark and continues to be a Mobil distributor, the March Dealer Sales Contract, unlike the 1997 and 2000 PMPA Franchise Agreements, neither refers to Drake's Distributor Agreement with Mobil nor contains any provision authorizing Ms. Amaral to use the Mobil trademark in connection with the retail sale of motor fuel.

27.    When Ms. Amaral refused to sign the March Lease and Dealer Sales Contract, Drake sent her a letter dated September 15, 2004 in which it advised her that, effective January 1, 2005, it would reduce the $.05 per gallon rent rebate granted in the Rent Reduction Letter to $.02 per gallon and eliminate the $1,500.00 per month rebate for 24 hour operation "per Article III, Part E of the [1993 PMPA Franchise] Agreement." A true and correct copy of the September 15 letter is attached as **Exhibit I.**

28.    In a face-to-face meeting and numerous telephone conversations with Ms. Amaral about the March Lease and Dealer Sales Contract during the period August to October 2004, Drake's Vice President of Motor Fuels & Market Development, Peter R. Potter, Jr. ("Mr. Potter"), assured her that neither the rent she would be paying after January 1, 2005 as a result of

8

the September 15 letter nor the rent she would pay under a new Lease would be higher than she was currently paying because Drake has been collecting the higher rent *all along* in the form of prices for gasoline on average five cents higher than it agreed to charge under the 1993, 1997 and 2000 PMPA Franchise Agreements.

29.    Mr. Potter has repeatedly admitted to Ms. Amaral that Drake had been collecting what it felt was the appropriate rent for the Station by recapturing the five cents per gallon rent credit it has been extending to Ms. Amaral since August 1995 under the Rent Reduction Letter in the form of higher gasoline prices.

30.    As a result, the actual rent Drake has collected from Ms. Amaral since August 1995 has been, on average, approximately $5,000 per month more than it represented to be her rent obligation, as stated in its Rent Calculation Worksheets and as drafted from her bank account each month. Without giving Ms. Amaral ninety days' notice that it was withdrawing the five cents per gallon rent rebate as required under the Rent Reduction Letter and Article III, Paragraph E of the 1993 PMPA Franchise Agreement, Drake simply made up for the lost rental revenue by tacking an extra five cents per gallon on to the prices it charged her for motor fuel.

31.    As a result of such practice, Ms. Amaral has been forced to pay Drake far more per gallon for motor fuel than other dealers, and consistently more than she would have been required to pay per gallon had she been purchasing motor fuel directly from Mobil. Because their cost of product is lower, competing gasoline stations, including a nearby XtraMart station supplied by Drake and operated by Drake's employees, agents, licensees or affiliated company, have been able to charge, and have routinely charged, retail prices for gasoline just pennies above, and in some cases at or below, Ms. Amaral's *cost*, thus placing her at a severe competitive disadvantage, and depressing gasoline and convenience store sales at the Station.

9

32.    By letter dated October 7, 2004, Ms. Amaral (a) objected to the withdrawal by Drake of the $1,500.00 24-hour rent credit and to the reduction of the five cent per gallon credit to two cents; (b) advised Drake that the rents proposed in the March Lease were higher than other dealers were paying, and more than she could afford to pay, especially given the high prices Drake was charging her for motor fuel, which were not allowing her to be competitive, and (c) requested that Drake state in writing what it had previously stated orally during contract negotiations it was proposing to charge in rent and for motor fuel. A true and correct copy of the October 7th letter is attached as **Exhibit J.**

33.    On November 18, 2004, Ms. Amaral received from Drake a new Lease and Dealer Sales Contract, true and correct copies of which are attached as **Exhibits K** ("November Lease") and **L** ("November Dealer Sales Contract"), respectively.

34.    The November Lease contains the same terms as the March Lease except that (a) Annual Base Rents are reduced approximately $2,000 per month from those specified in the March Lease (November Lease, ¶3 (a)-(c)); (b) Ms. Amaral's liability for real estate taxes is reduced from 100% to 50% (Id., ¶6); and (c) the amount of the security deposit is now set at $25,000.00. Id., ¶37.

35.    The November Dealer Sales Contract contains the same terms as the March Dealer Sales Contract with the following exceptions:

       a.    The blanks in Paragraph 3 of the March Dealer Sales Contract have been filled in so as to not only increase Ms. Amaral's contract minimum by 31% from 1,143,100 under the 2000 PMPA Franchise Agreement to 1,500,000 gallons of motor fuel per year, but require her to pay Drake a five cents per gallon surcharge for each gallon by which purchases fell short of the minimum. November Dealer Sales Contract, ¶3;

       b.    The pricing provision (¶4) has been changed. Where the March Dealer Sales Contract set prices for motor fuel at Drake's "established dealer tankwagon price for [Drake]'s dealers for the respective grades of products delivered in effect at the time and for the place of delivery," the

November Dealer Sales Contract sets prices for motor fuel at Drake's "rack price" from Mobil plus five cents per gallon;

c.    The payment terms (¶6) have been changed. Where the March Dealer Sales Contract requires payment "in cash or by certified or bank cashier's check upon delivery," the November Dealer Sales Contract requires payment via Electronic Funds Transfer. Id., ¶6; and

d.    A new paragraph (¶29) has been added providing, in the event Ms. Amaral's gasoline purchases exceeded her 125,000 gallon monthly minimum purchase obligation under Paragraph 3, that:

    i.    In year one, Drake would reduce by three (3) cents the price charged for gallons 125,001 to 150,000, and by four (4) cents the prices charged for gallons 150,001 and above; and

    ii.    In years two and three, Drake would reduce by four (4) cents the prices charged for gallons 125,001 to 150,000, and by three (3) cents per gallon the prices charged for gallons 150,001 and above.

36.    In 2003, the Station purchased 1.2 million gallons of motor fuel from Drake.

37.    Purchases by the Station for 2004 are expected to drop to 1.1 million gallons of motor fuel.

38.    In no year since Ms. Amaral began operating the Station has she purchased more than 1.2 million gallons of motor fuel. In only one month (August 2003) have purchases in any month during the last two calendar years come close (124,900) to the 125,000 gallons per month Ms. Amaral would be required to purchase every month under the November Dealer Sales Contract to meet the minimum purchase requirement, qualify for the volume incentive rebates, and avoid immediate termination for failure to meet the monthly minimum.

39.    By establishing a 1.5 million gallon minimum purchase requirement under Paragraph 3 of the November Dealer Sales Contract that bears no relationship to the Station's historical purchases, Drake will thus not only guarantee to itself payment, over and above rent, of least an additional $15,000 per year (300,000 gallons times $.05 per gallon), but, more

11

importantly, the right to immediately terminate the Dealer Sales Contract when Ms. Amaral inevitably fails to meet the minimum monthly purchase requirement.

40.    While Ms. Amaral's obligation under Paragraph 6 of the November Lease to pay 50% of the $17,000 real estate taxes represents half of the tax obligation proposed under Paragraph 6 of the March Lease, it is 50% more than Drake offered during contract negotiations. Because Ms. Amaral was not obligated to pay any real estate taxes under the 1993, 1997 and 2000 PMPA Franchise Agreements, the November Lease will increase Ms. Amaral's operating expenses by $8,500 per year.

41.    Taken together, the likely gallonage surcharge of at least $15,000 per year and the new real estate tax liability of $8,500 per year would approximately offset the apparent $2,000 per month rent reductions in the November Lease from those stated in the March Lease.

42.    In addition to the bad faith, unfair and/or deceptive conduct alleged in paragraphs 13 to 40, Drake has engaged in a pervasive pattern of unfair and/or deceptive conduct towards Ms. Amaral, including but not limited to:

a.    presenting Ms. Amaral with a new contract fifteen months after expiration of the 2000 PMPA Franchise Agreement;

b.    failing to negotiate in good faith over the terms of a new contract;

c.    proposing a Lease and Dealer Sales Contract (i) seeking to impose numerous unfair and/or deceptive terms on Ms. Amaral; (ii) stating terms less favorable and/or different from those stated orally; and (iii) which would require Ms. Amaral to waive numerous substantive and procedural rights granted franchisees under the PMPA and state law;

d.    threatening to terminate her franchise in order to replace her with a more "aggressive" dealer;

e.    threatening, if she objected to Drake's management about the high rents being proposed in the Lease, to charge her even higher rents;

f.    threatening to and selling motor fuel at a nearby XtraMart station at prices near or below Ms. Amaral's cost;

12

g.    thwarting possible sale of her franchise by indicating to her that she had nothing to sell because she did not have a contract;

h.    threatening to convert the Marketing Premises to another use, such as a CVS or Rite-Aid Pharmacy, if she did not sign the Lease and Dealer Contract as presented;

i.    suggesting that she give up her franchise and begin posing for pornographic photographs because she could make more money doing so than she was making from operating the Station;

j.    charging her prices for motor fuel on average five cents more per gallon than she was required to pay under the 1993, 1997 and 1999 Franchise Agreements as additional rent while falsely representing that the Rent Calculation Worksheets stated the full amount of her rent obligations;

k.    Consistently charging her prices for motor fuel which were not set in good faith or in a commercially reasonable manner and which placed the Station at a severe disadvantage in competing against other gasoline stations in the Fall River/Dartmouth/New Bedford market, and depressed motor fuel and convenience store sales as well as the value of her franchise in the market for the sale of gasoline service station franchises; and

l.    Threatening to not only withdraw the $1,500 24-hour rent rebate and reduce the per gallon rent rebate from $.05 to $.02 under the September 15, 2004 letter but to continue to charge her an extra $.05 per gallon for motor fuel if she did not sign a new Lease and Dealer Sales Contract substantially in the form presented.

43.    Drake has engaged in such unfair and/or deceptive conduct with the purpose and intent of driving Ms. Amaral out of business.

44.    On December 6, 2004, Ms. Amaral filed a civil action against Drake in the Superior Court for Bristol County alleging breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, and unfair and/or deceptive conduct in violation of M.G.L. c.93A, §11.

45.    By letter dated March 15, 2005, Arista Development, LLC ("Arista") conveyed to Drake through a third-party, Hunter Development, LLC ("Hunter"), an offer to enter into an option agreement with Drake under which Arista or its nominee would have the right, but not

13

obligation, to purchase the Marketing Premises for $1,925,000.00 ("March Option to Purchase").

A true and correct copy of the March Option to Purchase is attached as **Exhibit M.**

46. On June 17, 2005, Drake gave Arista, or its nominee, an option, in the exercise of

Arista's sole discretion, to purchase the Marketing Premises for One Million Nine Hundred

Twenty Five Thousand Dollars ($1,925,000.00) ("June Option to Purchase"). A true and correct

copy of the June Option to Purchase is attached as **Exhibit N.**

47. By certified letter dated July 1, 2005 (but not actually received by Ms. Amaral

until July 19, 2005), Drake notified Ms. Amaral that it was not renewing her franchise effective

November, 2005 ("Notice of Non-Renewal"). The letter states in pertinent part that:

> [Drake] has received an offer made by another person to purchase
> [Drake]'s interest in the [Marketing] Premises, and [Drake] had
> accepted that offer ("Offer"). Accordingly, [Drake] has hereby
> notifies you that because its decision in the normal course of
> business to sell the [Marketing] Premises, [Drake] does not intend
> to renew the franchise/franchise relationship between you and
> [Drake] with respect to the [Marketing] Premises or otherwise, and
> that such non-renewal shall take effect on November 1, 2005.
>
> * * *
>
> Attached is a copy of the fully executed Offer. Accordingly,
> pursuant to 15 U.S.C. Sec. 2802(D)(iii)(II)[sic], [Drake] hereby
> offers you as Franchisee at the Premises a right of first refusal with
> respect to the Offer [which] ... shall remain in effect through
> September 1, 2005. ..."

Attached to Drake's Notice of Non-Renewal was a copy of the June Option to Purchase and a

summary of the PMPA prepared by the Department of Energy. A true and correct copy of

Drake's Notice of Non-Renewal is attached as **Exhibit O.**

## COUNT I

### (Breach of Contract)

48. Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the

allegations of paragraphs 1 to 47 above.

14

49.     By charging Ms. Amaral more per gallon for motor fuel than the prices in effect at

the time and place of delivery for that class of customer in which she then fell, and/or by

collecting monthly rent in excess of the amounts Ms. Amaral was contractually obligated to pay,

Drake has committed knowing and material breaches of the 1993, 1997, and 2000 PMPA

Franchise Agreements.

50.     Ms. Amaral has suffered substantial damages as a result of Drake's material

breaches of contract.

## COUNT II

### (Breach of Implied Covenant Of
### Good Faith and Fair Dealing)

51.     Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the

allegations of paragraphs 1 to 50 above.

52.     Drake's actions have had, and continue to have, the effect of destroying or

injuring the right of Ms. Amaral to receive the benefits of the 1993, 1997, and 2000 PMPA

Franchise Agreements and her franchise (including without limitation the rent reductions

specified in the Rent Reduction Letter and the prices for motor fuel specified in such

agreements) in violation of the covenant of good faith and fair dealing implied in such

agreements.

53.     As a direct and proximate result of Drake's breach of the implied covenant of

good faith and fair dealing, Ms. Amaral has suffered substantial damages.

## COUNT III

### (Fraudulent Misrepresentation)

54.     Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the

allegations of paragraphs 1 to 53 above.

15

55.    Drake has deposited in the United States mails on a monthly basis Rent Calculation Worksheets addressed to Ms. Amaral falsely stating an amount in net rent less than the actual amount of rent collected by Drake.

56.    Since September 1995, Drake has collected monies via electronic funds transfer from Ms. Amaral's business checking account in excess of the net amount she owed in rent under the Rent Calculation Worksheets and the rent and pricing provisions of the 1993, 1997 and 2000 PMPA Franchise Agreements.

57.    Drake's misrepresentations regarding the amount of rent charged Ms. Amaral were made with the actual intent to deceive Ms. Amaral.

58.    Ms. Amaral reasonably relied to her detriment upon Drake's misrepresentations.

## COUNT VI

### (Violation of M.G.L. c.106, §2-305(2)

59.    Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 58 above.

60.    Drake is a merchant in the sale of goods within the meaning of M.G.L. c.104, §2-104(a).

61.    Drake has violated the open price provision of the Uniform Commercial Code, M.G.L. c.106, §2-305(2), by setting prices to Ms. Amaral in bad faith (motivated by an improper underlying purpose to recapture the money lost under the 24-hour and volume rent rebates extended to Ms. Amaral), and/or without observing reasonable commercial standards of fair dealing in the trade.

62.    Ms. Amaral has suffered a loss of money or property as a direct and proximate result of Drake's violation of the open price provision of the Uniform Commercial Code.

16

## COUNT V

### (Violation of M.G.L. c.93A, §11)

63.   Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 62 above.

64.   At all relevant times, Ms. Amaral and Drake have been engaged in the conduct of trade or commerce.

65.   The actions of Drake constitute unfair and/or deceptive acts or practices and willful and knowing violations of M.G.L. c.93A, §11.

66.   Ms. Amaral has suffered a loss of money or property as a direct and proximate result of Drake's unfair and/or deceptive acts or practices.

## COUNT VII

### (Violation of PMPA, 15 U.S.C. §2801 et. seq.)

67.   Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 66 above.

68.   Drake's decision to sell the Marketing Premises was not made in good faith, but, instead, was made in order to discriminate against Ms. Amaral, and to punish and retaliate against her for:

> (i)        Filing a lawsuit against Drake;
>
> (ii)       Refusing to compromise the claims asserted in such lawsuit;
>
> (iii)      Refusing to agree to changes or additions to the provisions of the franchise which were proposed by Drake in bad faith, for the purpose of converting the Marketing Premises to operation by Drake employees or agents by forcing Ms. Amaral out of business, and/or for the purpose of preventing the renewal of the franchise relationship in violation of 15 U.S.C. §§ 2802(b)(3)(A) and (D)(ii); and

17

(iv) Refusing to agree to a franchise renewal impermissibly conditioned on Ms. Amaral's release or waiver of rights granted franchisees under the PMPA and state law in violation of 15 U.S.C. §2805(f)(1)(A).

69. Drake's underlying decision to sell the Marketing Premises was in bad faith and not the result of its normal decision making process:

(i) The decision to grant Arista an option to purchase was arbitrary and capricious and made with the intent to discriminate and retaliate against Ms. Amaral;

(ii) The decision to grant Arista an option to purchase was made for the purpose of terminating Ms. Amaral's franchise while preserving the possibility of transfer of the Marketing Premises to direct management by Drake employees in the event that Arista elected, in its sole discretion, not to exercise its option to purchase in the period after the scheduled end of Ms. Amaral's franchise;

(iii) The decision to grant Arista an option to purchase for non-service station use was contrary to Drake's frequently expressed position that continued ownership of the Marketing Premises for the sale of motor fuel was in its economic self-interest because the Station was earning Drake a substantial profit and had the potential to earn even greater profits in the future;

(iv) The decision to grant Arista an option to purchase was made despite the fact that the Station had never previously been a candidate for divestment;

(v) The decision to grant Arista an option to purchase was made over a year after Drake offered to renew Ms. Amaral's franchise and after extensive contract negotiations between Drake and Ms. Amaral;

(vi) The decision to grant Arista an option to purchase was made a year after Drake made a tangible long-term commitment to continued operation of the Marketing Premises as a Mobil-branded station by spending approximately $50,000 to improve the Station's appearance to bring it into conformity with Mobil's image standards;

(vii) The decision to grant Arista an option to purchase was not made until after the filing of the instant lawsuit, after Ms. Amaral, in the face of an express threat to withdraw the volume and 24-hour rent credits pursuant to the September 15th letter, rejected through her

18

counsel Drake's offer to settle the instant litigation, and just two weeks after Mr. Potter testified at his deposition that Drake would sell the Station to Arista unless Ms. Amaral agreed to Drake's terms;

(viii)    The decision was made to accomplish business purposes not permitted by the PMPA, i.e. to discriminate against Ms. Amaral, retaliate against her for the filing of the instant lawsuit, deprive of her of a source of income with which to litigate her claims against Drake, and deprive her of her reasonable expectation of renewal of her franchise and continuation of the franchise relationship, or, in the event of a sale, of her reasonable expectation of being offered the Station at a fair price;

(ix)    The decision to offer a third-party the option to purchase the Marketing Premises was at variance with Drake's customary practice of first offering to sell locations identified for divestment to the current lessee dealers;

(x)    The inclusion by Drake as a special condition in the June Option to Purchase of a requirement that the buyer, in the event of a future sale, place a deed restriction on the property prohibiting any future sale of gasoline from the property was intended solely to prevent Ms. Amaral, were she to exercise her right of first refusal, from selling her business as a going concern to a third-party and/or from selling the property for continued use as gasoline service station.

(xi)    The June Option to Purchase is not a bona fide offer to purchase because, by its terms, it reserves to Arista the option to terminate the agreement at any time; and

(xii)    Drake set a price for the Marketing Premises which improperly included a premium above its fair market value as a gasoline service station in order to compensate Drake for the loss of profits it would have realized had it been able to continue selling gasoline to the buyer.

70.    Drake has violated its obligations under §2802(b)(3)(D)(iii) of the PMPA in at least the following respects:

(i)    It has failed during the 90-day period *after* notification of non-renewal to make a bona fide offer to sell to Ms. Amaral Drake's interest in the Marketing Premises;

19

(ii)        It has failed during the 90-day period *after* notification of non-renewal to offer Ms. Amaral a right of first refusal of at least 45 days duration of an offer made by another;

(iii)       The June Option to Purchase does not constitute a bona fide offer to purchase Drake's interest in the Marketing Premises triggering Drake's obligation to offer Ms. Amaral a right of first refusal because it only binds Drake to sell the property and does not contain an unconditional and binding promise by Arista to purchase the property;

(iv)       Drake has failed to make a bona fide offer to sell to Ms. Amaral equipment necessary for continued operation as a gasoline service station because the June Option to Purchase reserves to Drake the right, at its option, to remove all fixtures and equipment from the Marketing Premises prior to closing; and

(v)       Drake demanded a price from Arista which it knew was substantially in excess of the fair market value of the Marketing Premises for continued use for the sale of motor fuel, and which it knew Ms. Amaral would be unable to meet, thus intentionally depriving her of her reasonable expectation of being to purchase the Marketing Premises for fair market value.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiff Marnie J. Amaral requests that this Court:

A.    Issue a preliminary injunction and thereafter a permanent injunction ordering

Drake Petroleum Company, Inc. and its respective officers, agents, servants, employees, and

attorneys, and those persons in active concert or participation with them, to:

(1)       refrain from interfering with, altering, or discontinuing in any

manner the normal and usual business arrangements which Ms.

Amaral has enjoyed under the PMPA Franchise Agreement dated

May 11, 2000;

(2)       Negotiate in good faith over the terms of a new franchise

agreement and thereafter present to Ms. Amaral a Lease and

Dealer Sales Contract which continue the franchise and franchise

relationship between the parties within the meaning of Section

2801(1)(A), (B)(i), (ii) and (2) of the PMPA and do not require

Ms. Amaral to waive any substantive or procedural right granted

franchisees under the PMPA and state law.

B.      Issue a preliminary injunction and thereafter a permanent injunction ordering

Drake Petroleum Company, Inc. and its respective officers, agents, servants, employees, and

attorneys, and those persons in active concert or participation with them, to:

(1)      Continue providing Ms. Amaral a $1,500 rent rebate for operating

the Station 24 hours per day and a volume rent credit of $.05 per

gallon from gallon one;

(2)      Continue providing Ms. Amaral monthly Rent Calculation

Worksheets reflecting deductions of the $1,500 24-hour rent

rebate, the $.05 per gallon rent credit, the amount collected under

the gallonage collection program and the net rent to be drafted

from her account on the fifteenth day of the following month;

(3)      Draft from Ms. Amaral's account, in full satisfaction of her rent

obligation, only the net rent specified on the monthly Rent

Calculation Worksheets;

(4)      Charge Ms. Amaral a price for motor fuel equal to Mobil's price to

Drake at the Providence rack, less any applicable discounts, plus

three cents per gallon, plus the actual cost of delivery from the

Providence rack to the Station.

21

C.    Declare and adjudge that:

(1)    The changes or additions proposed by Drake to the franchise in the March and November Leases and Dealer Sales Contracts were not the result of determinations made by Drake in good faith and in the normal course of its business and that any failure by Ms. Amaral to agree to such changes or additions would not provide grounds for nonrenewal of the franchise relationship between the parties in accordance with Section 2802(b)(3)(A)(i) of the PMPA; and/or

(2)    The changes or additions proposed by Drake to the franchise in the March and November Leases and Dealer Sales Contracts are for the purpose of converting the leased Marketing Premises to operation by Drake employees or agents for Drake's benefit, or otherwise preventing the renewal of the franchise relationship, and thus preclude nonrenewal of the franchise relationship for failure to agree under Section 2802(b)(3)(A)(ii) of the PMPA; and/or

(3)    The November Lease and Dealer Sales Contract, if executed, would not result in renewal of a "franchise" and/or "franchise relationship" within the meaning of the PMPA, but would instead result in constructive nonrenewal of the franchise relationship in violation of Sections 2802(a)(2) and 2805(f)(1) of the PMPA; and/or

(4)    Paragraph 17(a) (vii) of the November Lease, which renders any failure to operate the convenience store on the leased premises for more than twenty-four consecutive hours or forty-eight hours

22

during any twelve month period a default of the Lease, violates

Section 4A (a) of Chapter 93E;

(5)     Drake's non-renewal of Ms. Amaral's franchise was not in good

faith and in the normal course of its business, and therefore

violated Section 2802(b)(2)(3)(D)(i)(III) of the PMPA;

(6)     Drake violated its obligations under Section 2802(b)(2)(3)(D)(iii)

of the PMPA in that it failed, during the 90- day period after

notification of non-renewal was given, to either make Ms. Amaral

a bona fide offer to sell, transfer, or assign to Ms. Amaral Drake's

interests in the Marketing Premises, and/or offer Ms. Amaral a

right of first refusal of at least 45 days duration of an offer, made

by another, to purchase Drake's interest in the Marketing Premises.

D.     Enter judgment declaring that Drake has committed material breaches of the 1993, 1997 and 2000 PMPA Franchise Agreements;

E.     Enter judgment declaring that Drake has breached the covenants of good faith and fair dealing implied in the 1993, 1997 and 2000 PMPA Franchise Agreements;

F.     Enter judgment declaring that Drake has violated the open price term of M.G.L. c.106, §2-305(3).

G.     Enter judgment declaring that Drake has engaged in unfair and/or deceptive trade practices in willful and knowing violation of M.G.L. c.93A, §11;

H.     Enter judgment declaring that Drake has violated the provisions of the PMPA, 15 U.S.C. §2801 et. seq.

I.     Award Ms. Amaral the actual damages she has suffered as a result of Drake's material breaches of the 1993, 1997 and 2000 PMPA Franchise Agreements;

23

J.     Award Ms. Amaral the actual damages she has suffered as a result of Drake's

material breaches of the covenants of good faith and fair dealing implied in the 1993, 1997 and

2000 PMPA Franchise Agreements;

K.     Award Ms. Amaral the actual damages she has suffered as a result of Drake's

violation of the open price term of M.G.L. c.106, §2-305(3).

L.     Award Ms. Amaral three times the actual damages she has suffered as a result of

Drake's willful and knowing violations of M.G.L. c.93A, §11, plus reasonable attorney's fees;

M.     Award Ms. Amaral actual and exemplary damages for Drake's violations of the

PMPA, plus reasonable attorney's and expert witness fees.

N.     Award Ms. Amaral the costs of this action; and

O.     Grant such other different and further relief as the Court deems appropriate.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES
THAT ARE TRIABLE BY JURY AS A MATTER OF RIGHT

MARNIE J. AMARAL
By her attorney,

Lindsey Marie Straus, Esquire
 BBO #554181
Law Office of Lindsey M. Straus
1583 Main Street
Brewster, MA 02631
(508) 896-8008

Dated: August 2, 2005

## CERTIFICATE OF SERVICE

I, Lindsey M. Straus, hereby certify that on this date I served the above-captioned document by e-mailing a copy and sending a hard copy, postage pre-paid, to Brian A. O'Connell, Zizik, Powers, O'Connell, Spaulding & Lamontagne, P.C., One Hollis Street, Suite 400, Wellesley, MA 02482.

Dated: August 2, 2005

Lindsey Marie Straus, Esq.

25

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
BRISTOL DIVISION
CIVIL ACTION NO.   BRCV2004-01354-

MARNIE J. AMARAL d/b/a M & E MOBIL
   Plaintiff,

     v.

DRAKE PETROLEUM COMPANY, INC.
   Defendant

COMPLAINT

## NATURE AND BASIS OF ACTION

1.  This is an action by a gasoline service station dealer against her supplier and lessor for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation, and unfair and deceptive trade practices in violation of M.G.L. c.93A, §11.

## PARTIES

2.  Plaintiff Marnie J. Amaral ("Ms. Amaral") lives in New Bedford, Bristol County, Massachusetts. Since 1988, she has operated a Mobil-brand gasoline station and convenience store on property located at 408 Rhode Island Avenue in Fall River ("Marketing Premises" or "the Station"). At all times relevant to this action, Ms. Amaral has been both a "franchisee" and "retailer" within the meaning of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801(4) and (7)("PMPA"), respectively.

3.  Defendant Drake Petroleum Company, Inc. ("Drake") is a Massachusetts corporation with a principal place of business at 221 Quinebaug Road, North Grosvenordale,

Connecticut. Drake is one of the largest independent distributors of gasoline and diesel in New England. Among the major brands Drake distributes are Mobil, Texaco, Sunoco, Citgo, Gulf, Getty and Exxon. At all times relevant to this action, Drake has been both a "franchisor" and "distributor" within the meaning of Sections 2801(3) and (6) of the PMPA, respectively. It is not a "refiner" within the meaning of Section 2801(5) of the PMPA.

FACTUAL ALLEGATIONS

4.    At all times relevant to this action, Mobil Oil Corporation ("Mobil") has been a "refiner" within the meaning of Section 2801(5) of the PMPA.

5.    In 1988, Ms. Amaral and Mobil entered into a written contract establishing a "franchise" and "franchise relationship" within the meaning of Section 2801(1) (A), (B)(i), (ii), and (2) of the PMPA.

6.    In October 1990, Ms. Amaral and Mobil extended their franchise relationship for an additional three -year term ending November 30, 1993.

7.    In or about June 1993, Mobil sent Ms. Amaral a letter stating that, effective December 1, 1993, she would begin receiving a $1,500 monthly rent credit for operating the Station on a 24-hour basis ("24-hour rent credit"). Mobil indicated that she would continue to receive the 24-hour rent credit unless and until it was withdrawn by Mobil on 90 days' written notice.

8.    By letter dated June 15, 1993, Mobil notified Ms. Amaral that, effective December 1, 1993, her rent would be reduced by five cents for every gallon of gasoline she purchased from Mobil ("Rent Reduction Letter"). The letter indicated Ms. Amaral would continue to receive the credit unless and until it was withdrawn by Mobil on 90 days' written notice. A true and correct copy of the Rent Reduction Letter is attached as **Exhibit A**.

2

9.      On or about October 22, 1993, Ms. Amaral and Mobil extended their franchise relationship for an additional three-year term ending November 30, 1996 ("1993 PMPA Franchise Agreement"). A true and correct copy of the 1993 PMPA Franchise Agreement is attached as **Exhibit B**.

10.     Under Article II, Paragraph A of the 1993 PMPA Franchise Agreement, Ms. Amaral was obligated to purchase from Mobil a minimum of 79,158 gallons per month and 1,143,100 gallons per year.

11.     Under Article II, Paragraph B of the 1993 PMPA Franchise Agreement, Mobil agreed to charge Ms. Amaral "prices [for motor fuel] in effect at time and place of delivery for that class of customer in which [Ms. Amaral] shall then fall, as determined by Mobil."

12.     Among other things, Article III, Paragraph D(1) of the 1993 PMPA Franchise Agreement (as amended by letter agreement dated October 18, 1993, a true correct copy of which is attached as **Exhibit C**) provided:

    (a)     for a nominal rent in years one to three of the contract of $110,300, $113,300 and $116,330 respectively;

    (b)     for collection of such rent on a "cents per gallon basis in such amount as determined by Mobil, upon delivery of each gallon of any motor fuel" to the Marketing Premises ("gallonage collection program"); and

    (c)     In the event "in any month ... the amount of rent collected [was] less than the rent due for the month," for Ms. Amaral to pay the deficiency to Mobil no later than the fifteenth day of the following month.

13.     Under Article III, Paragraph E of the 1993 PMPA Franchise Agreement, Mobil offered Ms. Amaral "the opportunity to participate in one or more rental reduction programs under which Dealer may pay a rental less than the contract rent specified in Paragraph D above," but reserved the "right to withdraw or modify any rental reduction program at any time [on] ... 90 days' advance written notice."

3

14. On August 17, 1995, Drake entered into a written Distributor Agreement with Mobil authorizing Drake to purchase Mobil-brand motor fuel at wholesale (i.e. "rack") prices, and use Mobil's trademark in connection with the sale and distribution of such branded product at retail outlets operated by Drake employees, agents, licensees or affiliated companies, and to retail locations leased to Mobil-franchise dealers.

15. At the same time, Drake purchased the Station from Mobil and took an assignment from Mobil of its rights and obligations under the 1993 PMPA Franchise Agreement, including Mobil's obligations as franchisor under the PMPA and its obligations under the Rent Reduction and 24-Hour Rent Letters.

16. From August 17, 1995 to November 6, 1997, Ms. Amaral operated the Station pursuant to the 1993 PMPA Franchise Agreement assigned to Drake. Since that time, her franchise and franchise relationship with Drake have been extended twice, first by agreement dated November 6, 1997, and subsequently by agreement dated May 11, 2000 ("2000 PMPA Franchise Agreement"). Both incorporated, except as otherwise stated, the terms of the 1993 PMPA Franchise Agreement, including without limitation the pricing (Article II, Paragraph B) and rental reduction (Article III, Paragraph III) provisions. A true and correct copy of the 2000 PMPA Franchise Agreement is attached as **Exhibit D**.

17. Like the 1993 and 1997 PMPA Franchise Agreements, the 2000 PMPA Franchise Agreement constitutes a "franchise" and establishes a "franchise relationship" within the meaning of Sections 2801(1) (A), (B) and (2) of the PMPA respectively.

18. Since September 1995, Drake has issued Ms. Amaral invoices on the first day of each month for the full amount of the rent specified in the 1993, 1997 and 2000 PMPA Franchise Agreements. At the beginning of the following month, Drake has mailed Ms. Amaral Rent Calculation Worksheets reflecting: (a) the full contract rent for the previous month, (b) the

4

$1,500.00 24-hour rent credit, (c) the five cents per gallon rent credit, (d) the net rent due for the month after deducting the rent credits, (e) the amount of rent already received by Drake under the gallonage collection program (2.3 cents times monthly motor fuel purchases), and (f) the net rent deficiency to be drafted via electronic funds transfer from Ms. Amaral's business checking account on the fifteenth day of the month. True and correct copies of representative monthly rent invoices and Rent Calculation Worksheets are attached as **Exhibits E** and **F** respectively.

19.    Based on the Rent Calculation Worksheets, Drake has drafted the net rent deficiency from Ms. Amaral's business checking account on the fifteenth day of each month.

20.    Ms. Amaral reasonably relied on the Rent Calculation Worksheets as setting forth the full amount of her rent obligation.

21.    On November 30, 2002, the 2000 PMPA Franchise Agreement expired but was extended pursuant to Article III, Section K of the 1993 PMPA Franchise Agreement.

22.    In March 2004, Drake offered Ms. Amaral a separate Lease and Dealer Sales Contract, true and correct copies of which are attached as **Exhibits G** ("March Lease") and **H** ("March Dealer Sales Contract") respectively.

23.    Among other things, the March Lease proposed to:

   a.    Lease to Ms. Amaral the *portion* of the Marketing Premises devoted to the operation of a convenience grocery store ("Leased Premises"), but *not* the portion devoted to the sale of motor fuel, including the pumps and underground storage tanks ("Adjacent Property"). March Lease, Preamble and ¶¶ 2, 35;

   b.    Reserve to Drake the right to operate a "motor fuels dispensing operation" on the Adjacent Property ("Motor Fuels Operation"). Id., ¶35;

   c.    Reserve to Drake the right during the term of the Lease, for any reason whatsoever, to "enter upon, remain on, and exit from the Leased Premises for the purpose of taking any actions [Drake] deemed necessary or appropriate in connection with the conduct of the Motor Fuels Operation, including without limitation, installing and operating cash registers or

5

computer consoles, and *depositing, withdrawing, and monitoring* receipts from sales from the Motor Fuels Operation. ..." Id. (emphasis supplied);

d.   Allow Ms. Amaral to "supervise the actual conduct" of the Motor Fuels Operation "so long as [she was] performing services with respect to the Motor Fuels Operation under the terms of the Dealer Sales Contract." Id.;

e.   Permit Drake "in the future [to] conduct the Motor Fuels Operation *without any participation by [Ms. Amaral]*," in which event Ms. Amaral would be required to operate the convenience store business in such a fashion as to not interfere with the Motor Fuels Operation, and Drake would have the right to install and maintain within the Leased Premises "*a separate cash register* for [Drake]'s cash and other receipts from sales from the Motor Fuels Operation. ..." Id. (emphasis supplied);

f.   Grant Drake the option to sell branded motor fuel for its own account on the Adjacent Property "subject to the terms and conditions of a franchise agreement with its branded supplier of motor fuels," in which case Ms. Amaral would be required to "comply with all requirements relating to the operation of the [Convenience Store] Business imposed upon [Drake] by its franchisor." Id., ¶36;

g.   Charge rent in the first year of $13,500 per month, an amount 23% more than the rent stated in the 2000 PMPA Franchise Agreement and approximately 250% more than the net monthly rent Ms. Amaral has been paying under that agreement after deduction of the 24-hour and volume rent credits. Id., ¶3(a);

h.   Discontinue all rent reduction programs, including the 24-hour and volume rent credits;

i.   Discontinue the gallonage collection program, requiring instead that Ms. Amaral pay the full monthly contract rent *in advance* on or before the first day of each month. Id.;

j.   Require Ms. Amaral, despite the fact that she was leasing only the convenience store building, to pay one hundred percent of the $17,000 annual real estate tax bill for the entire Property, taxes which had previously been paid entirely by Drake and included in the rent. Id., ¶¶ 4, 6;

k.   Allow Drake to terminate the Lease in the event the Leased Premises were so damaged or destroyed by fire or other casualty that such damage could not be repaired within 60 days, without being obligated, in the event the Station was subsequently rebuilt, to grant Ms. Amaral a right of first refusal of any franchise under which such premises were to be operated. Id., ¶9;

6

l.     Permit Drake to retain the entire proceeds received in the event all or part of the Leased Premises were taken by eminent domain, without being obligated to fairly apportion between Drake and Ms. Amaral the compensation, if any, received by Drake from the awarding authority based on any loss of business opportunity or good will. Id., ¶ 10;

m.    Permit Drake to terminate the Lease for failure to operate the convenience store on the Leased Premises for more than twenty-four (24) consecutive hours or forty-eight (48) hours during any twelve month period. Id., ¶17(a)(vii);

n.    Allow Drake, in the event of a default by Ms. Amaral, to immediately terminate the Lease without notice and immediately regain possession of the Leased Premises. Id., ¶17(b); and

o.    Require Ms. Amaral, on the last day of the term of the Lease, or upon earlier termination, to surrender possession of the Leased Premises to Drake. Id., ¶19.

24.    Absent from the proposed March Lease are any references to Drake's Distributor Agreement with Mobil, or any provisions continuing Ms. Amaral's Mobil franchise, including the right to (a) use and occupy the portion of the Marketing Premises used in connection with the sale and distribution of Mobil-brand motor fuel under Mobil's trademarks, including the pumps and underground storage tanks; and (b) use Mobil's trademarks in connection with the sale and distribution of Mobil-brand motor fuel.

25.    Among other things, the March Dealer Sales Contract proposed to:

a.    Require Ms. Amaral to purchase from Drake "gasoline and/or any other motor fuels of all kinds, grades, *brands* and quality being sold by" Drake at the time of delivery. March Dealer Sales Contract, ¶1 (emphasis supplied);

b.    Permit termination by Drake on the basis of a failure by Ms. Amaral to meet unspecified monthly or annual minimum product purchase requirements. Id., ¶¶ 3, 7(f);

c.    Permit termination by Drake, in the event of default by Ms. Amaral, on 10 days written notice, reduced to 5 days for any default based on failure to pay sums due and owing. Id., ¶8;

   d. Reserve to Drake "the right without prior notice to change, *abolish*, remove, substitute, or alter any of" the trademarks adopted and used by Drake in its business. Id., ¶12 (emphasis supplied); and

   e. Establish a three-month contractual statute of limitations within Ms. Amaral would be required to institute suit based on a claim arising out of the Dealer Sales Contract. Id., ¶13.

 26. Despite the fact that Drake has not suffered the loss of the right to authorize Ms. Amaral to use the Mobil trademark and continues to be a Mobil distributor, the March Dealer Sales Contract, unlike the 1997 and 2000 PMPA Franchise Agreements, neither refers to Drake's Distributor Agreement with Mobil nor contains any provision authorizing Ms. Amaral to use the Mobil trademark in connection with the retail sale of motor fuel.

 27. When Ms. Amaral refused to sign the March Lease and Dealer Sales Contract, Drake sent her a letter dated September 15, 2004 in which it advised her that, effective January 1, 2005, it would reduce the $.05 per gallon rent rebate granted in the Rent Reduction Letter to $.02 per gallon and eliminate the $1,500.00 per month rebate for 24 hour operation "per Article III, Part E of the [1993 PMPA Franchise] Agreement." A true and correct copy of the September 15 letter is attached as **Exhibit I.**

 28. In a face-to-face meeting and numerous telephone conversations with Ms. Amaral about the March Lease and Dealer Sales Contract during the period August to October 2004, Drake's Vice President of Motor Fuels & Market Development, Peter R. Potter, Jr. ("Mr. Potter"), assured her that neither the rent she would be paying after January 1, 2005 as a result of the September 15 letter nor the rent she would pay under a new Lease would be higher than she was currently paying because Drake has been collecting the higher rent *all along* in the form of prices for gasoline on average five cents higher than it agreed to charge under the 1993, 1997 and 2000 PMPA Franchise Agreements.

8

29. Mr. Potter has repeatedly admitted to Ms. Amaral that Drake had been collecting what it felt was the appropriate rent for the Station by recapturing the five cents per gallon rent credit it has been extending to Ms. Amaral since August 1995 under the Rent Reduction Letter in the form of higher gasoline prices.

30. As a result, the actual rent Drake has collected from Ms. Amaral since August 1995 has been, on average, approximately $5,000 per month more than it represented to be her rent obligation, as stated in its Rent Calculation Worksheets and as drafted from her bank account each month. Without giving Ms. Amaral ninety days' notice that it was withdrawing the five cents per gallon rent rebate as required under the Rent Reduction Letter and Article III, Paragraph E of the 1993 PMPA Franchise Agreement, Drake simply made up for the lost rental revenue by tacking an extra five cents per gallon on to the prices it charged her for motor fuel.

31. As a result of such practice, Ms. Amaral has been forced to pay Drake far more per gallon for motor fuel than other dealers, and consistently more than she would have been required to pay per gallon had she been purchasing motor fuel directly from Mobil. Because their cost of product is lower, competing gasoline stations, including a nearby XtraMart station supplied by Drake and operated by Drake's employees, agents, licensees or affiliated company, have been able to charge, and have routinely charged, retail prices for gasoline just pennies above, and in some cases at or below, Ms. Amaral's *cost*, thus placing her at a severe competitive disadvantage, and depressing gasoline and convenience store sales at the Station.

32. By letter dated October 7, 2004, Ms. Amaral (a) objected to the withdrawal by Drake of the $1,500.00 24-hour rent credit and to the reduction of the five cent per gallon credit to two cents; (b) advised Drake that the rents proposed in the March Lease were higher than other dealers were paying, and more than she could afford to pay, especially given the high prices Drake was charging her for motor fuel, which were not allowing her to be competitive,

9

and (c) requested that Drake state in writing what it had previously stated orally during contract

negotiations it was proposing to charge in rent and for motor fuel. A true and correct copy of the

October 7th letter is attached as **Exhibit J.**

33.    On November 18, 2004, Ms. Amaral received from Drake a new Lease and

Dealer Sales Contract, true and correct copies of which are attached as **Exhibits K** ("November

Lease") and **L** ("November Dealer Sales Contract"), respectively.

34.    The November Lease contains the same terms as the March Lease except that (a)

Annual Base Rents are reduced approximately $2,000 per month from those specified in the

March Lease (November Lease, ¶3 (a)-(c)); (b) Ms. Amaral's liability for real estate taxes is

reduced from 100% to 50% (Id., ¶6); and (c) the amount of the security deposit is now set at

$25,000.00. Id., ¶37.

35.    The November Dealer Sales Contract contains the same terms as the March

Dealer Sales Contract with the following exceptions:

      a.    The blanks in Paragraph 3 of the March Dealer Sales Contract have been
filled in so as to not only increase Ms. Amaral's contract minimum by
31% from 1,143,100 under the 2000 PMPA Franchise Agreement to
1,500,000 gallons of motor fuel per year, but require her to pay Drake a
five cents per gallon surcharge for each gallon by which purchases fell
short of the minimum. November Dealer Sales Contract, ¶3;

      b.    The pricing provision (¶4) has been changed. Where the March Dealer
Sales Contract set prices for motor fuel at Drake's "established dealer
tankwagon price for [Drake]'s dealers for the respective grades of
products delivered in effect at the time and for the place of delivery," the
November Dealer Sales Contract sets prices for motor fuel at Drake's
"rack price" from Mobil plus five cents per gallon;

      c.    The payment terms (¶6) have been changed. Where the March Dealer
Sales Contract requires payment "in cash or by certified or bank cashier's
check upon delivery," the November Dealer Sales Contract requires
payment via Electronic Funds Transfer. Id., ¶6; and

d.    A new paragraph (¶29) has been added providing, in the event Ms. Amaral's gasoline purchases exceeded her 125,000 gallon monthly minimum purchase obligation under Paragraph 3, that:

   i.    In year one, Drake would reduce by three (3) cents the price charged for gallons 125,001 to 150,000, and by four (4) cents the prices charged for gallons 150,001 and above; and

   ii.    In years two and three, Drake would reduce by four (4) cents the prices charged for gallons 125,001 to 150,000, and by three (3) cents per gallon the prices charged for gallons 150,001 and above.

36.    In 2003, the Station purchased 1.2 million gallons of motor fuel from Drake.

37.    Purchases by the Station for 2004 are expected to drop to 1.1 million gallons of motor fuel.

38.    In no year since Ms. Amaral began operating the Station has she purchased more than 1.2 million gallons of motor fuel. In only one month (August 2003) have purchases in any month during the last two calendar years come close (124,900) to the 125,000 gallons per month Ms. Amaral would be required to purchase every month under the November Dealer Sales Contract to meet the minimum purchase requirement, qualify for the volume incentive rebates, and avoid immediate termination for failure to meet the monthly minimum.

39.    By establishing a 1.5 million gallon minimum purchase requirement under Paragraph 3 of the November Dealer Sales Contract that bears no relationship to the Station's historical purchases, Drake will thus not only guarantee to itself payment, over and above rent, of least an additional $15,000 per year (300,000 gallons times $.05 per gallon), but, more importantly, the right to immediately terminate the Dealer Sales Contract when Ms. Amaral inevitably fails to meet the minimum monthly purchase requirement.

40.    While Ms. Amaral's obligation under Paragraph 6 of the November Lease to pay 50% of the $17,000 real estate taxes represents half of the tax obligation proposed under Paragraph 6 of the March Lease, it is 50% more than Drake offered during contract negotiations.

11

Because Ms. Amaral was not obligated to pay any real estate taxes under the 1993, 1997 and

2000 PMPA Franchise Agreements, the November Lease will increase Ms. Amaral's operating

expenses by $8,500 per year.

41.    Taken together, the likely gallonage surcharge of at least $15,000 per year and the

new real estate tax liability of $8,500 per year would approximately offset the apparent $2,000

per month rent reductions in the November Lease from those stated in the March Lease.

42.    In addition to the bad faith, unfair and/or deceptive conduct alleged in paragraphs

13 to 40, Drake has engaged in a pervasive pattern of unfair and/or deceptive conduct towards

Ms. Amaral, including but not limited to:

> a.    presenting Ms. Amaral with a new contract fifteen months after expiration
> of the 2000 PMPA Franchise Agreement;
>
> b.    failing to negotiate in good faith over the terms of a new contract;
>
> c.    proposing a Lease and Dealer Sales Contract (i) seeking to impose
> numerous unfair and/or deceptive terms on Ms. Amaral; (ii) stating terms
> less favorable and/or different from those stated orally; and (iii) which
> would require Ms. Amaral to waive numerous substantive and procedural
> rights granted franchisees under the PMPA and state law;
>
> d.    threatening to terminate her franchise in order to replace her with a more
> "aggressive" dealer;
>
> e.    threatening, if she objected to Drake's management about the high rents
> being proposed in the Lease, to charge her even higher rents;
>
> f.    threatening to and selling motor fuel at a nearby XtraMart station at prices
> near or below Ms. Amaral's cost;
>
> g.    thwarting possible sale of her franchise by indicating to her that she had
> nothing to sell because she did not have a contract;
>
> h.    threatening to convert the Marketing Premises to another use, such as a
> CVS or Rite-Aid Pharmacy, if she did not sign the Lease and Dealer
> Contract as presented;

12

    i.     suggesting that she give up her franchise and begin posing for pornographic photographs because she could make more money doing so than she was making from operating the Station;

    j.     charging her prices for motor fuel on average five cents more per gallon than she was required to pay under the 1993, 1997 and 1999 Franchise Agreements as additional rent while falsely representing that the Rent Calculation Worksheets stated the full amount of her rent obligations;

    k.    Consistently charging commercially unreasonable prices for motor fuel, placing the Station at a severe disadvantage in competing against other gasoline stations in the Fall River/Dartmouth/New Bedford market, and depressing motor fuel and convenience store sales as well as the value of her franchise in the market for the sale of gasoline service station franchises; and

    l.     Threatening to not only withdraw the $1,500 24-hour rent rebate and reduce the per gallon rent rebate from $.05 to $.02 under the September 15, 2004 letter but to continue to charge her an extra $.05 per gallon for motor fuel if she did not sign a new Lease and Dealer Sales Contract substantially in the form presented.

43.    Drake has engaged in such unfair and/or deceptive conduct with the purpose and intent of driving Ms. Amaral out of business.

## COUNT I

### (Breach of Contract)

44.    Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 43 above.

45.    By charging Ms. Amaral more per gallon for motor fuel than the prices in effect at the time and place of delivery for that class of customer in which she then fell, and/or by collecting monthly rent in excess of the amounts Ms. Amaral was contractually obligated to pay, Drake has committed knowing and material breaches of the 1993, 1997, and 2000 PMPA Franchise Agreements.

46.    Ms. Amaral has suffered substantial damages as a result of Drake's material breaches of contract.

## COUNT II

### (Breach of Implied Covenant Of
### Good Faith and Fair Dealing)

47.    Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 46 above.

48.    Drake's actions have had, and continue to have, the effect of destroying or injuring the right of Ms. Amaral to receive the benefits of the 1993, 1997, and 2000 PMPA Franchise Agreements and her franchise (including without limitation the rent reductions specified in the Rent Reduction Letter and the prices for motor fuel specified in such agreements) in violation of the covenant of good faith and fair dealing implied in such agreements.

49.    As a direct and proximate result of Drake's breach of the implied covenant of good faith and fair dealing, Ms. Amaral has suffered substantial damages.

## COUNT III

### (Fraudulent Misrepresentation)

50.    Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 49 above.

51.    Drake has deposited in the United States mails on a monthly basis Rent Calculation Worksheets addressed to Ms. Amaral falsely stating an amount in net rent less than the actual amount of rent collected by Drake.

52.    Since September 1995, Drake has collected monies via electronic funds transfer from Ms. Amaral's business checking account in excess of the net amount she owed in rent under the Rent Calculation Worksheets and the rent and pricing provisions of the 1993, 1997 and 2000 PMPA Franchise Agreements.

14

53.    Drake's misrepresentations regarding the amount of rent charged Ms. Amaral were made with the actual intent to deceive Ms. Amaral.

54.    Ms. Amaral reasonably relied to her detriment upon Drake's misrepresentations.

COUNT V

(M.G.L. c.93A, §11)

55.    Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 54 above.

56.    At all relevant times, Ms. Amaral and Drake have been engaged in the conduct of trade or commerce.

57.    The actions of Drake constitute unfair and/or deceptive acts or practices and willful and knowing violations of M.G.L. c.93A, §11.

58.    Ms. Amaral has suffered a loss of money or property as a direct and proximate result of Drake's unfair and/or deceptive acts or practices.

PRAYERS FOR RELIEF

WHEREFORE, plaintiff Marnie J. Amaral requests that this Court:

A.    Issue a preliminary injunction and thereafter a permanent injunction ordering Drake Petroleum Company, Inc. and its respective officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, to:

(1)    Continue providing Ms. Amaral a $1,500 rent rebate for operating the Station 24 hours per day and a volume rent credit of $.05 per gallon from gallon one;

(2)    Continue providing Ms. Amaral monthly Rent Calculation Worksheets reflecting deductions of the $1,500 24-hour rent

rebate, the $.05 per gallon rent credit, the amount collected under

the gallonage collection program and the net rent to be drafted

from her account on the fifteenth day of the following month;

(3)     Draft from Ms. Amaral's account, in full satisfaction of her rent

obligation, only the net rent specified on the monthly Rent

Calculation Worksheets;

(4)     Charge Ms. Amaral those prices for motor fuel as are then in effect

at time and place of delivery for that class of customer in which

she shall then fall, as required under Article II (B) of the 1993

PMPA Franchise Agreement, or Drake's established dealer

tankwagon price for Drake's dealers for the respective grades of

product delivered in effect at the time and for the place of delivery,

whichever is lower;

(5)     Provide to Ms. Amaral's counsel coincident with the issuance of

invoices to Ms. Amaral for motor fuel such document(s) as will

establish that the prices reflected on such invoices are equal to

those charged to customers in the same class as Ms. Amaral and to

Drake's established dealer tankwagon price for its dealers;

(6)     Negotiate in good faith over the terms of a new franchise

agreement and thereafter present to Ms. Amaral a Lease and

Dealer Sales Contract which continue the franchise and franchise

relationship between the parties within the meaning the meaning of

Section 2801(1)(A), (B)(i), (ii) and (2) of the PMPA and do not

16

require Ms. Amaral to waive any substantive or procedural right

granted franchisees under the PMPA and state law.

B.    Enter judgment declaring that Drake has committed material breaches of the 1993, 1997 and 2000 PMPA Franchise Agreements;

C.    Enter judgment declaring that Drake has breached the covenants of good faith and fair dealing implied in the 1993, 1997 and 2000 PMPA Franchise Agreements;

D.    Enter judgment declaring that Drake has engaged in unfair and/or deceptive trade practices in willful and knowing violation of M.G.L. c.93A, §11;

E.    Award Ms. Amaral the actual damages she has suffered as a result of Drake's material breaches of the 1993, 1997 and 2000 PMPA Franchise Agreements;

F.    Award Ms. Amaral the actual damages she has suffered as a result of Drake's material breaches of the covenants of good faith and fair dealing implied in the 1993, 1997 and 2000 PMPA Franchise Agreements;

G.    Award Ms. Amaral three times the actual damages she has suffered as a result of Drake's willful and knowing violations of M.G.L. c.93A, §11, plus reasonable attorney's fees;

H.    Award Ms. Amaral the costs of this action; and

I.    Grant such other different and further relief as the Court deems appropriate.

17

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES
THAT ARE TRIABLE BY JURY AS A MATTER OF RIGHT

MARNIE J. AMARAL
By her attorney,

*Lindsey M. S*

Lindsey Marie Straus, Esquire
BBO #554181
Law Office of Lindsey M. Straus
1583 Main Street
Brewster, MA 02631
(508) 896-8008

Dated: December 7, 2004

18

## COMMOMWEALTH OF MASSACHUSETTS

BRISTOL, SS.

SUPERIOR COURT DEPARTMENT OF THE
TRIAL COURT
BRISTOL DIVISION
C.A. NO.: BRCV2004-01354-C

MARNIE J. AMARAL D/B/A )
M & E MOBIL )
 )
      Plaintiff )
 )
   v. )
 )
DRAKE PETROLEUM COMPANY, INC. )
 )
      Defendant. )
                                    )

## DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendant, Drake petroleum Company, Inc. ("Drake") hereby makes this its answer to

plaintiff's complaint.

## NATURE AND BASIS OF ACTION

1.     The defendant denies the allegations contained in paragraph 1.

## PARTIES

2.     The defendant is without knowledge or information sufficient to form a belief as
to the truth of the allegations contained in paragraph 2 and calls upon the plaintiff to prove the
same.

3.     The defendant admits the allegations contained in paragraph 4.

## FACTUAL ALLEGATIONS

4.     The defendant is without knowledge or information sufficient to form a belief as
to the truth of the allegations contained in paragraph 4 and calls upon the plaintiff to prove the
same.

5.    The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 5 and calls upon the plaintiff to prove the same.

6.    The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 6 and calls upon the plaintiff to prove the same.

7.    The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 7 and calls upon the plaintiff to prove the same.

8.    The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 8 and calls upon the plaintiff to prove the same.

9.    The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 9 and calls upon the plaintiff to prove the same.

10.    The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 10 and calls upon the plaintiff to prove the same.

11.    The defendant is without knowledge or information sufficient to form a belief as

to the truth of the allegations contained in paragraph 11 and calls upon the plaintiff to prove the

same.

12.    The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 and calls upon the plaintiff to prove the same.

13.    The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 and calls upon the plaintiff to prove the same.

14.    The defendant denies the allegations contained in paragraph 14.

15.    The defendant admits the allegations contained in paragraph 15.

16.    The defendant admits the allegations contained in paragraph 16.

2

17. The defendant admits the allegations contained in paragraph 17.

18. The defendant admits the allegations contained in paragraph 18.

19. The defendant admits the allegations contained in paragraph 19.

20. The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20 and calls upon the plaintiff to prove the same.

21. The defendant admits the allegations contained in paragraph 21.

22. The defendant admits the allegations contained in paragraph 22.

23. a. Defendant admits that the proposed March lease, which the parties did not agree upon, contains language to this effect, but that was not defendant's intent. This provision of the proposed lease is not relevant.

b. Defendant admits that the proposed March lease, which the parties did not agree upon, contains language to this effect, but that was not defendant's intent. This provision of the proposed lease is not relevant.

c. Defendant admits that the proposed March lease, which the parties did not agree upon, contains language to this effect, but that was not defendant's intent. This provision of the proposed lease is not relevant.

d. Defendant admits that the proposed March lease, which the parties did not agree upon, contains language to this effect, but that was not defendant's intent. This provision of the proposed lease is not relevant.

e. Defendant admits that the proposed March lease, which the parties did not agree upon, contains language to this effect, but that was not defendant's intent. This provision of the proposed lease is not relevant.

f. Defendant admits that the proposed March lease, which the parties did not agree upon, contains language to this effect, but that was not defendant's intent. This provision of the proposed lease is not relevant.

g. The defendant admits the allegations contained in paragraph 23(g).

h. The defendant admits the allegations contained in paragraph 23(h).

i. The defendant admits the allegations contained in paragraph 23(i).

j. The defendant denies the allegations contained in paragraph 23(j).

3

k.  The defendant admits the allegations contained in paragraph 23(k).

l.  The defendant admits the allegations contained in paragraph 23(l).

m.  The defendant admits the allegations contained in paragraph 23(m).

n.  The defendant admits the allegations contained in paragraph 23(n).

o.  The defendant admits the allegations contained in paragraph 23(o).

24.  The defendant admits the allegations contained in paragraph 24.

25.  a.  The defendant admits the allegations contained in paragraph 25(a).

b.  The defendant admits the allegations contained in paragraph 25(b).

c.  The defendant admits the allegations contained in paragraph 25(c).

d.  The defendant admits the allegations contained in paragraph 25(d).

e.  The defendant admits the allegations contained in paragraph 25(e).

26.  The defendant admits the allegations contained in paragraph 26.

27.  The defendant admits that it sent Ms. Amaral Exhibit "I".

28.  The defendant denies the allegations contained in paragraph 28.

29.  The defendant denies the allegations contained in paragraph 29.

30.  The defendant denies the allegations contained in paragraph 30.

31.  The defendant denies the allegations contained in paragraph 31.

32.  Drake admits that Ms. Amaral's correspondence is attached to the complaint as Exhibit "J". Drake denies the substance of the allegations contained in Paragraph 32.

33.  The defendant admits the allegations contained in paragraph 33.

34.  The defendant admits the allegations contained in paragraph 34.

35.  a.  The defendant admits the allegations contained in paragraph 35(a).

b.  The defendant admits the allegations contained in paragraph 35(b).

4

c.    The defendant admits the allegations contained in paragraph 35(c).

d.    The defendant admits the allegations contained in paragraph 35(d).

   i.    The defendant admits the allegations contained in paragraph 35(d)(i).

   ii.    The defendant admits the allegations contained in paragraph 35(d)(ii).

36.    The defendant denies the allegations contained in paragraph 36.

37.    The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 37 and calls upon the plaintiff to prove the same.

38.    The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 38 and calls upon the plaintiff to prove the same.

39.    The defendant denies the allegations contained in paragraph 39.

40.    The defendant denies the allegations contained in paragraph 40.

41.    The defendant denies the allegations contained in paragraph 41.

42.    a.    The defendant denies the allegations contained in paragraph 43(a).

   b.    The defendant denies the allegations contained in paragraph 43(b).

   c.    The defendant denies the allegations contained in paragraph 43(b).

   d.    The defendant denies the allegations contained in paragraph 43(d).

   e.    The defendant denies the allegations contained in paragraph 43(e).

   f.    The defendant denies the allegations contained in paragraph 43(f).

   g.    The defendant denies the allegations contained in paragraph 43(g).

   h.    The defendant denies the allegations contained in paragraph 43(h).

   i.    The defendant denies the allegations contained in paragraph 43(i).

   j.    The defendant denies the allegations contained in paragraph 43(j).

   k.    The defendant denies the allegations contained in paragraph 43(k).

5

l.      The defendant denies the allegations contained in paragraph 43(l).

43.     The defendant denies the allegations contained in paragraph 43.

## COUNT I
### (Breach of Contract)

44.     The defendant repeats and realleges its responses to paragraphs 1 through 43 as fully set forth herein.

45.     The defendant denies the allegations contained in paragraph 45.

46.     The defendant denies the allegations contained in paragraph 46.

WHEREFORE, the defendant demands that the plaintiff's Complaint against it be dismissed and that judgment enter for the defendant together with its costs.

## COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

47.     The defendant repeats and realleges its responses to paragraphs 1 through 46 as fully set forth herein.

48.     The defendant denies the allegations contained in paragraph 48.

49.     The defendant denies the allegations contained in paragraph 49.

WHEREFORE, the defendant demands that the plaintiff's Complaint against it be dismissed and that judgment enter for the defendant together with its costs.

## COUNT III
### (Fraudulent Misrepresentation)

50.     The defendant repeats and realleges its responses to paragraphs 1 through 49 as fully set forth herein.

51.     The defendant denies the allegations contained in paragraph 51.

52.     The defendant denies the allegations contained in paragraph 52.

53.     The defendant denies the allegations contained in paragraph 53.

54.     The defendant denies the allegations contained in paragraph 54.



WHEREFORE, the defendant demands that the plaintiff's Complaint against it be dismissed and that judgment enter for the defendant together with its costs.

## COUNT V
### (M.G.L c. 93A, §11)

55.    The defendant repeats and realleges its responses to paragraphs 1 through 54 as fully set forth herein.

56.    The defendant denies the allegations contained in paragraph 56.

57.    The defendant denies the allegations contained in paragraph 57.

58.    The defendant denies the allegations contained in paragraph 58.

WHEREFORE, the defendant demands that the plaintiff's Complaint against it be dismissed and that judgment enter for the defendant together with its costs.

## AFFIRMATIVE DEFENSES

### SECOND DEFENSE

And further answering, the defendant says that the Complaint is barred by laches in that the defendant has been prejudiced by the excessive delay of the plaintiff in seeking the relief requested.

### THIRD DEFENSE

And further answering, the defendant says that the Complaint should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.

### FOURTH DEFENSE

And further answering, the defendant moves that the Complaint be dismissed insofar as the plaintiffs have participated in the transactions which gave rise to the relief sought by the plaintiffs.

### FIFTH DEFENSE

And further answering, the defendant says that the Complaint should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

### SIXTH DEFENSE

And further answering, the defendant says that the cause of action is barred by reason of the Statute of Limitations.

7

### SEVENTH DEFENSE

And further answering, the defendant moves that the Complaint be dismissed insofar as the plaintiffs have participated in the transactions which gave rise to the relief sought by the plaintiffs.

### EIGHTH DEFENSE

And further answering, the defendant says that if there were agreements between the parties, the debts have been satisfied.

### NINTH DEFENSE

And further answering, the defendant says that to the extent that it had any obligations to the plaintiff, such obligations have been fully, completely and properly performed in every respect.

### TENTH DEFENSE

And further answering, the plaintiff has failed to set forth the allegations regarding misrepresentation with the acquired specificity.

### JURY CLAIM

THE DEFENDANT CLAIMS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Defendant,
Drake Petroleum Company, Inc.
By Its Attorney



Brian A. O'Connell (BBO # 551182)
Zizik, Powers, O'Connell, Spaulding
& Lamontagne, P.C.
One Hollis Street, Suite 400
Wellesley, MA 02482
(781) 263-0202

### CERTIFICATE OF SERVICE

I, Brian A. O'Connell, hereby certify that on this 14th day of January, 2005, I served a copy of the foregoing on all parties to this action by mailing same, postage prepaid, to all counsel of record.



Brian A. O'Connell

8

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                           NEW BEDFORD DISTRICT COURT
                                       C.A. NO. 0533 CV 0210

ANGELO AMARAL,                    )
        PLAINTIFF,                )
                                  )
VS.                               )
                                  )
ROBERT GONSALVES AND,             )
ABC DISPOSAL SERVICE, INC.        )
        DEFENDANTS.               )

*Allow w/o opposition*
*∆ not appearing @ 9²⁵ am 7/5/*
*+ had informed π/Atty that*
*he would not appear.*

Now comes the plaintiff, Angelo Amaral, pursuant to Mass.R. Civ. P. 12(f)

and moves this Honorable Court to strike defendant, Robert Gonsalves', affirmative

defenses numbered 4 and 5 and ABC Disposal Service, Inc.'s, affirmative defenses

numbered 4 and 5.

In support of this motion, plaintiff, Angelo Amaral, states that "weeding out

legally insufficient defenses at an early stage of a law suit is extremely valuable to all

concerned in order to avoid the needless expenditures of time and money, in

litigating issues which can be foreseen to have no bearing on the outcome."

Narragansett Tribe of Indians v. So. R.I. Land Devel., 418 F. Supp. 798 (D.R.I. 1976).

Robert Gonsalves' Fourth Affirmative Defense:

The defendant says that there was insufficiency of process and insufficiency
of service of process.

Comment:

Service of process was made by Deputy Sheriff Paul M. Douglas by leaving at
the last and usual place of abode and by mailing first class mail to Robert Gonsalves
a copy of the Summons, Compliant, Statement of Damages, Interrogatories, Request
for Production of Documents. (Exhibit A)



**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only)___MARNIE J. AMARAL D/B/A M & E MOBIL v. DRAKE
   PETROLEUM COMPANY, INC.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local
   rule 40.1(a)(1)).

   | | | | |
   |---|---|---|---|
   | ☐ | I. | 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT. | |
   | ☑ | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. | *Also complete AO 120 or AO 121 for patent, trademark or copyright cases |
   | ☐ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891. | |
   | ☐ | IV. | 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900. | |
   | ☐ | V. | 150, 152, 153. | |

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this
   district please indicate the title and number of the first filed case in this court.
   MARNIE J. AMARAL D/B/A M & E MOBIL v. DRAKE PETROLEUM COMPANY, INC.; Bristol Superior Ct.;C.A. No. 04-1

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                                    YES ☐        NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC
   §2403)
                                                                    YES ☐        NO ☑
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                                    YES ☐        NO ☑

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                                    YES ☐        NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of
   Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
                                                                    YES ☑        NO ☐

   A.    If yes, in which division do all of the non-governmental parties reside?

         Eastern Division  ☑            Central Division  ☐            Western Division  ☐

   B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,
         residing in Massachusetts reside?

         Eastern Division  ☐            Central Division  ☐            Western Division  ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes,
   submit a separate sheet identifying the motions)
                                                                    YES ☐        NO ☑

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME ___Brian A. O'Connell, Esq.,
ADDRESS ___One Hollis Street, Suite 400, Wellesley, MA 02482
TELEPHONE NO. ___(781) 263-0202

(CategoryForm.wpd - 5/2/05)

%JS 44 (Rev. 11/04)

**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| **. (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| MARNIE J. AMARAL D/B/A M & E MOBIL | DRAKE PETROLEUM COMPANY, INC. |

| **(b)** County of Residence of First Listed Plaintiff    Bristol | County of Residence of First Listed Defendant    Middlesex |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

| **(c)** Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| Lindsey Marie Straus, Esq., Law Office of Lindsey M. Straus, 1583 Main Street, Brewster, MA 02631 (508) 896-8008 | Brian A. O'Connell, Esq., ZIZIK, POWERS, O'CONNELL, P.C., One Hollis Street, Suite 400, Wellesley, MA 02482, (781) 263-0202 |

**I. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**V. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☐ 1 Original Proceeding    ☒ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 USC, Section 2801

Brief description of cause:
Claim under 15 USC, Section 2801 the Petroleum Marketing Practices Act.

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:

**JURY DEMAND:** ☒ Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY**

(See instructions):   JUDGE   J. Moses (Bristol Superior)    DOCKET NUMBER BRCV04-1354

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE