**Commonwealth of Massachusetts**
**BRISTOL SUPERIOR COURT**
**Case Summary**
**Civil Docket**

# BRCV2004-01354
## Amaral v Drake Petroleum Company, Inc.

| | | | | | | |
|---|---|---|---|---|---|---|
| **File Date** | 12/07/2004 | **Status** | Disposed: transfered to other court (dtrans) | | | |
| **Status Date** | 09/06/2005 | **Session** | C - CtRm Main - (Taunton) | | | |
| **Origin** | 1 | **Case Type** | A99 - Misc contract | | | |
| **Lead Case** | | **Track** | F | | | |

| | | | | | |
|---|---|---|---|---|---|
| **Service** | 03/07/2005 | **Answer** | 05/06/2005 | **Rule12/19/20** | 05/06/2005 |
| **Rule 15** | 05/06/2005 | **Discovery** | 10/03/2005 | **Rule 56** | 11/02/2005 |
| **Final PTC** | 12/02/2005 | **Disposition** | 01/31/2006 | **Jury Trial** | Yes |

### PARTIES

**Plaintiff**
Marnie J. Amaral
408 Rhode Island Avenue
Fall River, MA 02720
Active 12/07/2004

**Private Counsel 554181**
Lindsey Marie Straus
1583 Main Street
Brewster, MA 02631-1477
Phone: 508-896-8008
Fax:
Active 12/07/2004 Notify

**Doing busnss as (alias)**
M & E Mobil
Active 12/07/2004

*** See Attorney Information Above ***

**Defendant**
Drake Petroleum Company, Inc.
221 Quinebaug Road
North Grosvenordale, CT 06255
Served: 12/13/2004
Answered: 01/18/2005
Answered 01/18/2005

**Private Counsel 551182**
Brian A O'Connell
Zizik Powers O'Connell Spaulding &
Lamontagne PC
1 Hollis Street
Suite 400
Wellesley, MA 02482
Phone: 781-431-8777
Fax: 781-431-8749
Active 01/26/2005 Notify

**Other interested party**
FILE COPY
Active 12/07/2004 Notify

A True Copy By Photostatic Process
Attest:

Asst. Clerk of Courts

### ENTRIES

| Date | Paper | Text |
|---|---|---|
| 12/07/2004 | 1.0 | Complaint & civil action cover sheet filed |
| 12/07/2004 | | Origin 1, Type A99, Track F. |

MAS-20041213    Case 1:05-cv-11778-DPW   Document 5   Filed 09/08/2005    Page 2 of 28
lagejess                      Commonwealth of Massachusetts                           09/06/2005
                              BRISTOL SUPERIOR COURT                                  03:27 PM
                                   Case Summary
                                   Civil Docket

## BRCV2004-01354
## Amaral v Drake Petroleum Company, Inc.

| Date | Paper | Text |
|---|---|---|
| 12/08/2004 | | Notice of 93A complaint sent to Attorney General |
| 12/20/2004 | 2.0 | SERVICE RETURNED: Drake Petroleum Company, Inc.(Defendant) |
| 01/18/2005 | 3.0 | ANSWER by Drake Petroleum Company, Inc. to COMPLAINT (claim of trial by jury reqstd) |
| 08/05/2005 | | Pleading, First Amended Complaint , returned to Lindsey Marie Straus, Esq.: An answer having been filed on 1/18/05 Motion to Amend must be filed pursuant to rule 15 |
| 08/16/2005 | 4.0 | Plaintiff Marnie J. Amaral's MOTION for Leave to file first Amended Complaint, assented to |
| 08/17/2005 | | Plaintiff's motion #4: to amend complaint (assented to), there being no opposition on file pursuant to MA Superior Court Rule 9A (indeed assent indicated), this motion is ALLOWED. (Moses, J.) |
| 08/17/2005 | 5.0 | Amended complaint of Marnie J. Amaral d/b/a M & E Mobil |
| 09/06/2005 | | Case REMOVED this date to US District Court of Massachusetts |

### EVENTS

| Date | Session | Event | Result |
|---|---|---|---|
| 12/07/2004 | CtRm Main - (Taunton) | Status: by clerk | Event held as scheduled |
| | | Initial One-trial Review | |

FILED

~ 6 2005

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

CLERK/MAGISTRATE

MARNIE J. AMARAL D/B/A
M & E MOBIL

05-11778 DPW

Plaintiff

v.

DRAKE PETROLEUM COMPANY, INC.

Defendant.

Hereby certify on that the foregoing document is true and correct copy of the electronic docket in the captioned case electronically filed original filed on original filed in my office on

Sarah A. Thornton
Clerk U.S. District Court
District of Massachusetts
By
Deputy Clerk

## DEFENDANT'S NOTICE OF REMOVAL OF CAUSE TO UNITED STATED DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

In support of this petition, petitioner, Drake Petroleum Company, Inc., respectfully shows the following.

1. Petitioner, Drake Petroleum Company, Inc., is the defendant in the above entitled action.

2. The above entitled action was commenced in the Superior Court for the County of Bristol, in the Commonwealth of Massachusetts and is now pending before that court. On August 17, 2005, Plaintiff served Defense Counsel with an Amended Complaint setting forth a new claim under 15 U.S.C. §2801 et seq., the Petroleum Marketing Practices Act (PMPA).

3. This action is now a civil action of which this court has original jurisdiction under 28 U.S.C.. §1331, and is one that the defendant is entitled to remove to this court pursuant to 28 U.S.C. § 1446, in that the plaintiff is claiming a cause of action under 15 U.S.C. §2801 et seq.

4. Defendant attaches copies of all process, pleadings, and orders served in this action to this Notice.

A True Copy By Photostatic Process
Attest:

Asst. Clerk of Courts

Wherefore, Defendant prays that this Honorable Court remove the above action now

pending against it in the Superior Court for the County of Bristol, in the Commonwealth of

Massachusetts, Docket No. BRCV2004-01354-C, from state court to this Court.

> Petitioner/Defendant,
> Drake Petroleum Company, Inc.
> By Its Attorney
>
> Brian A. O'Connell (BBO # 551182)
> Zizik, Powers, O'Connell, Spaulding
> & Lamontagne, P.C.
> One Hollis Street, Suite 400
> Wellesley, MA 02482
> (781) 263-0202

## CERTIFICATE OF SERVICE

I, Laura K. Peltonen, hereby certify that on this ___ day of August, 2005, I served a
copy of the foregoing on all parties to this action by mailing same, postage prepaid, to all counsel
of record.

Laura K. Peltonen

2

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

MARNIE J. AMARAL D/B/A       )
M & E MOBIL                  )
                             )       C.A. NO.:
          Plaintiff          )
                             )
     v.                      )
                             )
DRAKE PETROLEUM COMPANY, INC. )
                             )
          Defendant.         )
_____)

## AFFIDAVIT OF FILING OF COPY
## OF NOTICE OF REMOVAL

I, Laura Peltonen, on oath depose and say that on August 24, 2005, I filed a copy of the

Notice of Removal in the above matter with the Clerk of the Bristol Superior Court, Bristol

County, Massachusetts.

Signed under the pains and penalties of perjury this 24th day of August, 2005.

Laura K. Peltonen

(# 5)

## COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
BRISTOL DIVISION
CIVIL ACTION NO. BRCV2004-
01354-C

MARNIE J. AMARAL d/b/a M & E MOBIL

      Plaintiff,

                   v.

DRAKE PETROLEUM COMPANY, INC.

      Defendant

A True Copy By Photostatic Process
Attest:

                    Asst. Clerk of Courts

### FIRST AMENDED COMPLAINT

> BRISTOL, SS SUPERIOR COURT
> **FILED**
> AUG 1 7 2005
> MARC J. SANTOS, ESQ.
> CLERK/MAGISTRATE

### NATURE AND BASIS OF ACTION

1.    This is an action by a gasoline service station dealer against her supplier and

lessor for breach of contract, breach of the implied covenant of good faith and fair dealing,

fraudulent misrepresentation, breach of the open price provision of the Uniform Commercial

Code, M.G.L. c.106, §2-305(2), unfair and deceptive trade practices in violation of M.G.L.

c.93A, §11, and wrongful non-renewal under the Petroleum Marketing Practices Act, 15 U.S.C.

§2801 et. seq.

### PARTIES

2.    Plaintiff Marnie J. Amaral ("Ms. Amaral") lives in New Bedford, Bristol County,

Massachusetts. Since 1988, she has operated a Mobil-brand gasoline station and convenience

store on property located at 408 Rhode Island Avenue in Fall River ("Marketing Premises" or

"the Station"). At all times relevant to this action, Ms. Amaral has been both a "franchisee" and

"retailer" within the meaning of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801(4) and (7)("PMPA"), respectively.

3.      Defendant Drake Petroleum Company, Inc. ("Drake") is a Massachusetts corporation with a principal place of business at 221 Quinebaug Road, North Grosvenordale, Connecticut. Drake is one of the largest independent distributors of gasoline and diesel in New England. Among the major brands Drake distributes are Mobil, Texaco, Sunoco, Citgo, Gulf, Getty and Exxon. At all times relevant to this action, Drake has been both a "franchisor" and "distributor" within the meaning of Sections 2801(3) and (6) of the PMPA, respectively. It is not a "refiner" within the meaning of Section 2801(5) of the PMPA.

FACTUAL ALLEGATIONS

4.      At all times relevant to this action, Mobil Oil Corporation ("Mobil") has been a "refiner" within the meaning of Section 2801(5) of the PMPA.

5.      In 1988, Ms. Amaral and Mobil entered into a written contract establishing a "franchise" and "franchise relationship" within the meaning of Section 2801(1) (A), (B)(i), (ii), and (2) of the PMPA.

6.      In October 1990, Ms. Amaral and Mobil extended their franchise relationship for an additional three –year term ending November 30, 1993.

7.      In or about June 1993, Mobil sent Ms. Amaral a letter stating that, effective December 1, 1993, she would begin receiving a $1,500 monthly rent credit for operating the Station on a 24-hour basis ("24-hour rent credit"). Mobil indicated that she would continue to receive the 24-hour rent credit unless and until it was withdrawn by Mobil on 90 days' written notice.

8.      By letter dated June 15, 1993, Mobil notified Ms. Amaral that, effective December 1, 1993, her rent would be reduced by five cents for every gallon of gasoline she

2

purchased from Mobil ("Rent Reduction Letter"). The letter indicated Ms. Amaral would continue to receive the credit unless and until it was withdrawn by Mobil on 90 days' written notice. A true and correct copy of the Rent Reduction Letter is attached as **Exhibit A**.

9.     On or about October 22, 1993, Ms. Amaral and Mobil extended their franchise relationship for an additional three-year term ending November 30, 1996 ("1993 PMPA Franchise Agreement"). A true and correct copy of the 1993 PMPA Franchise Agreement is attached as **Exhibit B**.

10.     Under Article II, Paragraph A of the 1993 PMPA Franchise Agreement, Ms. Amaral was obligated to purchase from Mobil a minimum of 95,258 gallons per month and 1,143,100 gallons per year.

11.     Under Article II, Paragraph B of the 1993 PMPA Franchise Agreement, Mobil agreed to charge Ms. Amaral "prices [for motor fuel] in effect at time and place of delivery for that class of customer in which [Ms. Amaral] shall then fall, as determined by Mobil."

12.     Among other things, Article III, Paragraph D(1) of the 1993 PMPA Franchise Agreement (as amended by letter agreement dated October 18, 1993, a true correct copy of which is attached as **Exhibit C**) provided:

> (a)     for a nominal rent in years one to three of the contract of $110,300, $113,300 and $116,330 respectively;
>
> (b)     for collection of such rent on a "cents per gallon basis in such amount as determined by Mobil, upon delivery of each gallon of any motor fuel" to the Marketing Premises ("gallonage collection program"); and
>
> (c)     In the event "in any month ... the amount of rent collected [was] less than the rent due for the month," for Ms. Amaral to pay the deficiency to Mobil no later than the fifteenth day of the following month.

13.     Under Article III, Paragraph E of the 1993 PMPA Franchise Agreement, Mobil offered Ms. Amaral "the opportunity to participate in one or more rental reduction programs

3

under which Dealer may pay a rental less than the contract rent specified in Paragraph D above," but reserved the "right to withdraw or modify any rental reduction program at any time [on] ... 90 days' advance written notice."

14.     On August 17, 1995, Drake entered into a written Distributor Agreement with Mobil authorizing Drake to purchase Mobil-brand motor fuel at wholesale (i.e. "rack") prices, and use Mobil's trademark in connection with the sale and distribution of such branded product at retail outlets operated by Drake employees, agents, licensees or affiliated companies, and to retail locations leased to Mobil-franchise dealers.

15.     At the same time, Drake purchased the Station from Mobil and took an assignment from Mobil of its rights and obligations under the 1993 PMPA Franchise Agreement, including Mobil's obligations as franchisor under the PMPA and its obligations under the Rent Reduction and 24-Hour Rent Letters.

16.     From August 17, 1995 to November 6, 1997, Ms. Amaral operated the Station pursuant to the 1993 PMPA Franchise Agreement assigned to Drake.  Since that time, her franchise and franchise relationship with Drake have been extended twice, first by agreement dated November 6, 1997, and subsequently by agreement dated May 11, 2000 ("2000 PMPA Franchise Agreement").  Both incorporated, except as otherwise stated, the terms of the 1993 PMPA Franchise Agreement, including without limitation the pricing (Article II, Paragraph B) and rental reduction (Article III, Paragraph III) provisions.  A true and correct copy of the 2000 PMPA Franchise Agreement is attached as **Exhibit D**.

17.     Like the 1993 and 1997 PMPA Franchise Agreements, the 2000 PMPA Franchise Agreement constitutes a "franchise" and establishes a "franchise relationship" within the meaning of Sections 2801(1) (A), (B) and (2) of the PMPA respectively.

4

18.    Since September 1995, Drake has issued Ms. Amaral invoices on the first day of each month for the full amount of the rent specified in the 1993, 1997 and 2000 PMPA Franchise Agreements.  At the beginning of the following month, Drake has mailed Ms. Amaral Rent Calculation Worksheets reflecting: (a) the full contract rent for the previous month, (b) the $1,500.00 24-hour rent credit, (c) the five cents per gallon rent credit, (d) the net rent due for the month after deducting the rent credits, (e) the amount of rent already received by Drake under the gallonage collection program (2.3 cents times monthly motor fuel purchases), and (f) the net rent deficiency to be drafted via electronic funds transfer from Ms. Amaral's business checking account on the fifteenth day of the month.  True and correct copies of representative monthly rent invoices and Rent Calculation Worksheets are attached as **Exhibits E** and **F** respectively.

19.    Based on the Rent Calculation Worksheets, Drake has drafted the net rent deficiency from Ms. Amaral's business checking account on the fifteenth day of each month.

20.    Ms. Amaral reasonably relied on the Rent Calculation Worksheets as setting forth the full amount of her rent obligation.

21.    On November 30, 2002, the 2000 PMPA Franchise Agreement expired but was extended pursuant to Article III, Section K of the 1993 PMPA Franchise Agreement.

22.    In March 2004, Drake offered Ms. Amaral a separate Lease and Dealer Sales Contract, true and correct copies of which are attached as **Exhibits G** ("March Lease") and **H** ("March Dealer Sales Contract") respectively.

23.    Among other things, the March Lease proposed to:

  a.    Lease to Ms. Amaral the *portion* of the Marketing Premises devoted to the operation of a convenience grocery store ("Leased Premises"), but *not* the portion devoted to the sale of motor fuel, including the pumps and underground storage tanks ("Adjacent Property").  March Lease, Preamble and ¶¶ 2, 35;

5

b.   Reserve to Drake the right to operate a "motor fuels dispensing operation" on the Adjacent Property ("Motor Fuels Operation"). Id., ¶35;

c.   Reserve to Drake the right during the term of the Lease, for any reason whatsoever, to "enter upon, remain on, and exit from the Leased Premises for the purpose of taking any actions [Drake] deemed necessary or appropriate in connection with the conduct of the Motor Fuels Operation, including without limitation, installing and operating cash registers or computer consoles, and *depositing, withdrawing, and monitoring* receipts from sales from the Motor Fuels Operation. ..." Id. (emphasis supplied);

d.   Allow Ms. Amaral to "supervise the actual conduct" of the Motor Fuels Operation "so long as [she was] performing services with respect to the Motor Fuels Operation under the terms of the Dealer Sales Contract." Id.;

e.   Permit Drake "in the future [to] conduct the Motor Fuels Operation *without any participation by [Ms. Amaral]*," in which event Ms. Amaral would be required to operate the convenience store business in such a fashion as to not interfere with the Motor Fuels Operation, and Drake would have the right to install and maintain within the Leased Premises "*a separate cash register* for [Drake]'s cash and other receipts from sales from the Motor Fuels Operation. ..." Id. (emphasis supplied);

f.   Grant Drake the option to sell branded motor fuel for its own account on the Adjacent Property "subject to the terms and conditions of a franchise agreement with its branded supplier of motor fuels," in which case Ms. Amaral would be required to "comply with all requirements relating to the operation of the [Convenience Store] Business imposed upon [Drake] by its franchisor." Id., ¶36;

g.   Charge rent in the first year of $13,500 per month, an amount 23% more than the rent stated in the 2000 PMPA Franchise Agreement and approximately 250% more than the net monthly rent Ms. Amaral has been paying under that agreement after deduction of the 24-hour and volume rent credits. Id., ¶3(a);

h.   Discontinue all rent reduction programs, including the 24-hour and volume rent credits;

i.   Discontinue the gallonage collection program, requiring instead that Ms. Amaral pay the full monthly contract rent *in advance* on or before the first day of each month. Id.;

j.   Require Ms. Amaral, despite the fact that she was leasing only the convenience store building, to pay one hundred percent of the $17,000 annual real estate tax bill for the entire Property, taxes which had

6

previously been paid entirely by Drake and included in the rent. Id., ¶¶ 4, 6;

k.  Allow Drake to terminate the Lease in the event the Leased Premises were so damaged or destroyed by fire or other casualty that such damage could not be repaired within 60 days, without being obligated, in the event the Station was subsequently rebuilt, to grant Ms. Amaral a right of first refusal of any franchise under which such premises were to be operated. Id., ¶9;

l.  Permit Drake to retain the entire proceeds received in the event all or part of the Leased Premises were taken by eminent domain, without being obligated to fairly apportion between Drake and Ms. Amaral the compensation, if any, received by Drake from the awarding authority based on any loss of business opportunity or good will. Id., ¶ 10;

m.  Permit Drake to terminate the Lease for failure to operate the convenience store on the Leased Premises for more than twenty-four (24) consecutive hours or forty-eight (48) hours during any twelve month period. Id., ¶17(a)(vii);

n.  Allow Drake, in the event of a default by Ms. Amaral, to immediately terminate the Lease without notice and immediately regain possession of the Leased Premises. Id., ¶17(b); and

o.  Require Ms. Amaral, on the last day of the term of the Lease, or upon earlier termination, to surrender possession of the Leased Premises to Drake. Id., ¶19.

24.  Absent from the proposed March Lease are any references to Drake's Distributor Agreement with Mobil, or any provisions continuing Ms. Amaral's Mobil franchise, including the right to (a) use and occupy the portion of the Marketing Premises used in connection with the sale and distribution of Mobil-brand motor fuel under Mobil's trademarks, including the pumps and underground storage tanks; and (b) use Mobil's trademarks in connection with the sale and distribution of Mobil-brand motor fuel.

25.  Among other things, the March Dealer Sales Contract proposed to:

a.  Require Ms. Amaral to purchase from Drake "gasoline and/or any other motor fuels of all kinds, grades, *brands* and quality being sold by" Drake at the time of delivery. March Dealer Sales Contract, ¶1 (emphasis supplied);

7

b.    Permit termination by Drake on the basis of a failure by Ms. Amaral to meet unspecified monthly or annual minimum product purchase requirements. Id., ¶¶ 3, 7(f);

c.    Permit termination by Drake, in the event of default by Ms. Amaral, on 10 days written notice, reduced to 5 days for any default based on failure to pay sums due and owing. Id., ¶8;

d.    Reserve to Drake "the right without prior notice to change, *abolish*, remove, substitute, or alter any of" the trademarks adopted and used by Drake in its business. Id., ¶12 (emphasis supplied); and

e.    Establish a three-month contractual statute of limitations within Ms. Amaral would be required to institute suit based on a claim arising out of the Dealer Sales Contract. Id., ¶13.

26.    Despite the fact that Drake has not suffered the loss of the right to authorize Ms. Amaral to use the Mobil trademark and continues to be a Mobil distributor, the March Dealer Sales Contract, unlike the 1997 and 2000 PMPA Franchise Agreements, neither refers to Drake's Distributor Agreement with Mobil nor contains any provision authorizing Ms. Amaral to use the Mobil trademark in connection with the retail sale of motor fuel.

27.    When Ms. Amaral refused to sign the March Lease and Dealer Sales Contract, Drake sent her a letter dated September 15, 2004 in which it advised her that, effective January 1, 2005, it would reduce the $.05 per gallon rent rebate granted in the Rent Reduction Letter to $.02 per gallon and eliminate the $1,500.00 per month rebate for 24 hour operation "per Article III, Part E of the [1993 PMPA Franchise] Agreement." A true and correct copy of the September 15 letter is attached as **Exhibit I.**

28.    In a face-to-face meeting and numerous telephone conversations with Ms. Amaral about the March Lease and Dealer Sales Contract during the period August to October 2004, Drake's Vice President of Motor Fuels & Market Development, Peter R. Potter, Jr. ("Mr. Potter"), assured her that neither the rent she would be paying after January 1, 2005 as a result of

8

the September 15 letter nor the rent she would pay under a new Lease would be higher than she was currently paying because Drake has been collecting the higher rent *all along* in the form of prices for gasoline on average five cents higher than it agreed to charge under the 1993, 1997 and 2000 PMPA Franchise Agreements.

29.    Mr. Potter has repeatedly admitted to Ms. Amaral that Drake had been collecting what it felt was the appropriate rent for the Station by recapturing the five cents per gallon rent credit it has been extending to Ms. Amaral since August 1995 under the Rent Reduction Letter in the form of higher gasoline prices.

30.    As a result, the actual rent Drake has collected from Ms. Amaral since August 1995 has been, on average, approximately $5,000 per month more than it represented to be her rent obligation, as stated in its Rent Calculation Worksheets and as drafted from her bank account each month.  Without giving Ms. Amaral ninety days' notice that it was withdrawing the five cents per gallon rent rebate as required under the Rent Reduction Letter and Article III, Paragraph E of the 1993 PMPA Franchise Agreement, Drake simply made up for the lost rental revenue by tacking an extra five cents per gallon on to the prices it charged her for motor fuel.

31.    As a result of such practice, Ms. Amaral has been forced to pay Drake far more per gallon for motor fuel than other dealers, and consistently more than she would have been required to pay per gallon had she been purchasing motor fuel directly from Mobil.  Because their cost of product is lower, competing gasoline stations, including a nearby XtraMart station supplied by Drake and operated by Drake's employees, agents, licensees or affiliated company, have been able to charge, and have routinely charged, retail prices for gasoline just pennies above, and in some cases at or below, Ms. Amaral's *cost*, thus placing her at a severe competitive disadvantage, and depressing gasoline and convenience store sales at the Station.

9

32. By letter dated October 7, 2004, Ms. Amaral (a) objected to the withdrawal by Drake of the $1,500.00 24-hour rent credit and to the reduction of the five cent per gallon credit to two cents; (b) advised Drake that the rents proposed in the March Lease were higher than other dealers were paying, and more than she could afford to pay, especially given the high prices Drake was charging her for motor fuel, which were not allowing her to be competitive, and (c) requested that Drake state in writing what it had previously stated orally during contract negotiations it was proposing to charge in rent and for motor fuel. A true and correct copy of the October 7th letter is attached as **Exhibit J.**

33. On November 18, 2004, Ms. Amaral received from Drake a new Lease and Dealer Sales Contract, true and correct copies of which are attached as **Exhibits K** ("November Lease") and **L** ("November Dealer Sales Contract"), respectively.

34. The November Lease contains the same terms as the March Lease except that (a) Annual Base Rents are reduced approximately $2,000 per month from those specified in the March Lease (November Lease, ¶3 (a)-(c)); (b) Ms. Amaral's liability for real estate taxes is reduced from 100% to 50% (Id., ¶6); and (c) the amount of the security deposit is now set at $25,000.00. Id., ¶37.

35. The November Dealer Sales Contract contains the same terms as the March Dealer Sales Contract with the following exceptions:

    a. The blanks in Paragraph 3 of the March Dealer Sales Contract have been filled in so as to not only increase Ms. Amaral's contract minimum by 31% from 1,143,100 under the 2000 PMPA Franchise Agreement to 1,500,000 gallons of motor fuel per year, but require her to pay Drake a five cents per gallon surcharge for each gallon by which purchases fell short of the minimum. November Dealer Sales Contract, ¶3;

    b. The pricing provision (¶4) has been changed. Where the March Dealer Sales Contract set prices for motor fuel at Drake's "established dealer tankwagon price for [Drake]'s dealers for the respective grades of products delivered in effect at the time and for the place of delivery," the

10

November Dealer Sales Contract sets prices for motor fuel at Drake's "rack price" from Mobil plus five cents per gallon;

c.   The payment terms (¶6) have been changed. Where the March Dealer Sales Contract requires payment "in cash or by certified or bank cashier's check upon delivery," the November Dealer Sales Contract requires payment via Electronic Funds Transfer. Id., ¶6; and

d.   A new paragraph (¶29) has been added providing, in the event Ms. Amaral's gasoline purchases exceeded her 125,000 gallon monthly minimum purchase obligation under Paragraph 3, that:

  i.   In year one, Drake would reduce by three (3) cents the price charged for gallons 125,001 to 150,000, and by four (4) cents the prices charged for gallons 150,001 and above; and

  ii.  In years two and three, Drake would reduce by four (4) cents the prices charged for gallons 125,001 to 150,000, and by three (3) cents per gallon the prices charged for gallons 150,001 and above.

36.   In 2003, the Station purchased 1.2 million gallons of motor fuel from Drake.

37.   Purchases by the Station for 2004 are expected to drop to 1.1 million gallons of motor fuel.

38.   In no year since Ms. Amaral began operating the Station has she purchased more than 1.2 million gallons of motor fuel. In only one month (August 2003) have purchases in any month during the last two calendar years come close (124,900) to the 125,000 gallons per month Ms. Amaral would be required to purchase every month under the November Dealer Sales Contract to meet the minimum purchase requirement, qualify for the volume incentive rebates, and avoid immediate termination for failure to meet the monthly minimum.

39.   By establishing a 1.5 million gallon minimum purchase requirement under Paragraph 3 of the November Dealer Sales Contract that bears no relationship to the Station's historical purchases, Drake will thus not only guarantee to itself payment, over and above rent, of least an additional $15,000 per year (300,000 gallons times $.05 per gallon), but, more

11

importantly, the right to immediately terminate the Dealer Sales Contract when Ms. Amaral inevitably fails to meet the minimum monthly purchase requirement.

40.     While Ms. Amaral's obligation under Paragraph 6 of the November Lease to pay 50% of the $17,000 real estate taxes represents half of the tax obligation proposed under Paragraph 6 of the March Lease, it is 50% more than Drake offered during contract negotiations. Because Ms. Amaral was not obligated to pay any real estate taxes under the 1993, 1997 and 2000 PMPA Franchise Agreements, the November Lease will increase Ms. Amaral's operating expenses by $8,500 per year.

41.     Taken together, the likely gallonage surcharge of at least $15,000 per year and the new real estate tax liability of $8,500 per year would approximately offset the apparent $2,000 per month rent reductions in the November Lease from those stated in the March Lease.

42.     In addition to the bad faith, unfair and/or deceptive conduct alleged in paragraphs 13 to 40, Drake has engaged in a pervasive pattern of unfair and/or deceptive conduct towards Ms. Amaral, including but not limited to:

> a.   presenting Ms. Amaral with a new contract fifteen months after expiration of the 2000 PMPA Franchise Agreement;
>
> b.   failing to negotiate in good faith over the terms of a new contract;
>
> c.   proposing a Lease and Dealer Sales Contract (i) seeking to impose numerous unfair and/or deceptive terms on Ms. Amaral; (ii) stating terms less favorable and/or different from those stated orally; and (iii) which would require Ms. Amaral to waive numerous substantive and procedural rights granted franchisees under the PMPA and state law;
>
> d.   threatening to terminate her franchise in order to replace her with a more "aggressive" dealer;
>
> e.   threatening, if she objected to Drake's management about the high rents being proposed in the Lease, to charge her even higher rents;
>
> f.   threatening to and selling motor fuel at a nearby XtraMart station at prices near or below Ms. Amaral's cost;

g.      thwarting possible sale of her franchise by indicating to her that she had
        nothing to sell because she did not have a contract;

h.      threatening to convert the Marketing Premises to another use, such as a
        CVS or Rite-Aid Pharmacy, if she did not sign the Lease and Dealer
        Contract as presented;

i.      suggesting that she give up her franchise and begin posing for
        pornographic photographs because she could make more money doing so
        than she was making from operating the Station;

j.      charging her prices for motor fuel on average five cents more per gallon
        than she was required to pay under the 1993, 1997 and 1999 Franchise
        Agreements as additional rent while falsely representing that the Rent
        Calculation Worksheets stated the full amount of her rent obligations;

k.      Consistently charging her prices for motor fuel which were not set in good
        faith or in a commercially reasonable manner and which placed the Station
        at a severe disadvantage in competing against other gasoline stations in the
        Fall River/Dartmouth/New Bedford market, and depressed motor fuel and
        convenience store sales as well as the value of her franchise in the market
        for the sale of gasoline service station franchises; and

l.      Threatening to not only withdraw the $1,500 24-hour rent rebate and
        reduce the per gallon rent rebate from $.05 to $.02 under the September
        15, 2004 letter but to continue to charge her an extra $.05 per gallon for
        motor fuel if she did not sign a new Lease and Dealer Sales Contract
        substantially in the form presented.

43.     Drake has engaged in such unfair and/or deceptive conduct with the purpose and

intent of driving Ms. Amaral out of business.

44.     On December 6, 2004, Ms. Amaral filed a civil action against Drake in the

Superior Court for Bristol County alleging breach of contract, breach of the implied covenant of

good faith and fair dealing, fraud, and unfair and/or deceptive conduct in violation of M.G.L.

c.93A, §11.

45.     By letter dated March 15, 2005, Arista Development, LLC ("Arista") conveyed to

Drake through a third-party, Hunter Development, LLC ("Hunter"), an offer to enter into an

option agreement with Drake under which Arista or its nominee would have the right, but not

13

obligation, to purchase the Marketing Premises for $1,925,000.00 ("March Option to Purchase").

A true and correct copy of the March Option to Purchase is attached as **Exhibit M**.

46.    On June 17, 2005, Drake gave Arista, or its nominee, an option, in the exercise of

Arista's sole discretion, to purchase the Marketing Premises for One Million Nine Hundred

Twenty Five Thousand Dollars ($1,925,000.00) ("June Option to Purchase"). A true and correct

copy of the June Option to Purchase is attached as **Exhibit N.**

47.    By certified letter dated July 1, 2005 (but not actually received by Ms. Amaral

until July 19, 2005), Drake notified Ms. Amaral that it was not renewing her franchise effective

November, 2005 ("Notice of Non-Renewal"). The letter states in pertinent part that:

> [Drake] has received an offer made by another person to purchase
> [Drake]'s interest in the [Marketing] Premises, and [Drake] had
> accepted that offer ("Offer"). Accordingly, [Drake] has hereby
> notifies you that because its decision in the normal course of
> business to sell the [Marketing] Premises, [Drake] does not intend
> to renew the franchise/franchise relationship between you and
> [Drake] with respect to the [Marketing] Premises or otherwise, and
> that such non-renewal shall take effect on November 1, 2005.
>
> * * *
>
> Attached is a copy of the fully executed Offer. Accordingly,
> pursuant to 15 U.S.C. Sec. 2802(D)(iii)(II)[sic], [Drake] hereby
> offers you as Franchisee at the Premises a right of first refusal with
> respect to the Offer [which] … shall remain in effect through
> September 1, 2005. …"

Attached to Drake's Notice of Non-Renewal was a copy of the June Option to Purchase and a

summary of the PMPA prepared by the Department of Energy. A true and correct copy of

Drake's Notice of Non-Renewal is attached as **Exhibit O.**

### COUNT I

### (Breach of Contract)

48.    Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the

allegations of paragraphs 1 to 47 above.

14

49.     By charging Ms. Amaral more per gallon for motor fuel than the prices in effect at the time and place of delivery for that class of customer in which she then fell, and/or by collecting monthly rent in excess of the amounts Ms. Amaral was contractually obligated to pay, Drake has committed knowing and material breaches of the 1993, 1997, and 2000 PMPA Franchise Agreements.

50.     Ms. Amaral has suffered substantial damages as a result of Drake's material breaches of contract.

## COUNT II

### (Breach of Implied Covenant Of
### Good Faith and Fair Dealing)

51.     Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 50 above.

52.     Drake's actions have had, and continue to have, the effect of destroying or injuring the right of Ms. Amaral to receive the benefits of the 1993, 1997, and 2000 PMPA Franchise Agreements and her franchise (including without limitation the rent reductions specified in the Rent Reduction Letter and the prices for motor fuel specified in such agreements) in violation of the covenant of good faith and fair dealing implied in such agreements.

53.     As a direct and proximate result of Drake's breach of the implied covenant of good faith and fair dealing, Ms. Amaral has suffered substantial damages.

## COUNT III

### (Fraudulent Misrepresentation)

54.     Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 53 above.

15

55.    Drake has deposited in the United States mails on a monthly basis Rent Calculation Worksheets addressed to Ms. Amaral falsely stating an amount in net rent less than the actual amount of rent collected by Drake.

56.    Since September 1995, Drake has collected monies via electronic funds transfer from Ms. Amaral's business checking account in excess of the net amount she owed in rent under the Rent Calculation Worksheets and the rent and pricing provisions of the 1993, 1997 and 2000 PMPA Franchise Agreements.

57.    Drake's misrepresentations regarding the amount of rent charged Ms. Amaral were made with the actual intent to deceive Ms. Amaral.

58.    Ms. Amaral reasonably relied to her detriment upon Drake's misrepresentations.

COUNT VI

(Violation of M.G.L. c.106, §2-305(2))

59.    Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 58 above.

60.    Drake is a merchant in the sale of goods within the meaning of M.G.L. c.104, §2-104(a).

61.    Drake has violated the open price provision of the Uniform Commercial Code, M.G.L. c.106, §2-305(2), by setting prices to Ms. Amaral in bad faith (motivated by an improper underlying purpose to recapture the money lost under the 24-hour and volume rent rebates extended to Ms. Amaral), and/or without observing reasonable commercial standards of fair dealing in the trade.

62.    Ms. Amaral has suffered a loss of money or property as a direct and proximate result of Drake's violation of the open price provision of the Uniform Commercial Code.

16

## COUNT V

### (Violation of M.G.L. c.93A, §11)

63.    Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 62 above.

64.    At all relevant times, Ms. Amaral and Drake have been engaged in the conduct of trade or commerce.

65.    The actions of Drake constitute unfair and/or deceptive acts or practices and willful and knowing violations of M.G.L. c.93A, §11.

66.    Ms. Amaral has suffered a loss of money or property as a direct and proximate result of Drake's unfair and/or deceptive acts or practices.

## COUNT VII

### (Violation of PMPA, 15 U.S.C. §2801 et. seq.)

67.    Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 66 above.

68.    Drake's decision to sell the Marketing Premises was not made in good faith, but, instead, was made in order to discriminate against Ms. Amaral, and to punish and retaliate against her for:

> (i)    Filing a lawsuit against Drake;
>
> (ii)    Refusing to compromise the claims asserted in such lawsuit;
>
> (iii)    Refusing to agree to changes or additions to the provisions of the franchise which were proposed by Drake in bad faith, for the purpose of converting the Marketing Premises to operation by Drake employees or agents by forcing Ms. Amaral out of business, and/or for the purpose of preventing the renewal of the franchise relationship in violation of 15 U.S.C. §§ 2802(b)(3)(A) and (D)(ii); and

17

(iv)     Refusing to agree to a franchise renewal impermissibly conditioned on Ms. Amaral's release or waiver of rights granted franchisees under the PMPA and state law in violation of 15 U.S.C. §2805(f)(1)(A).

69.     Drake's underlying decision to sell the Marketing Premises was in bad faith and

not the result of its normal decision making process:

(i)     The decision to grant Arista an option to purchase was arbitrary and capricious and made with the intent to discriminate and retaliate against Ms. Amaral;

(ii)     The decision to grant Arista an option to purchase was made for the purpose of terminating Ms. Amaral's franchise while preserving the possibility of transfer of the Marketing Premises to direct management by Drake employees in the event that Arista elected, in its sole discretion, not to exercise its option to purchase in the period after the scheduled end of Ms. Amaral's franchise;

(iii)     The decision to grant Arista an option to purchase for non-service station use was contrary to Drake's frequently expressed position that continued ownership of the Marketing Premises for the sale of motor fuel was in its economic self-interest because the Station was earning Drake a substantial profit and had the potential to earn even greater profits in the future;

(iv)     The decision to grant Arista an option to purchase was made despite the fact that the Station had never previously been a candidate for divestment;

(v)     The decision to grant Arista an option to purchase was made over a year after Drake offered to renew Ms. Amaral's franchise and after extensive contract negotiations between Drake and Ms. Amaral;

(vi)     The decision to grant Arista an option to purchase was made a year after Drake made a tangible long-term commitment to continued operation of the Marketing Premises as a Mobil-branded station by spending approximately $50,000 to improve the Station's appearance to bring it into conformity with Mobil's image standards;

(vii)     The decision to grant Arista an option to purchase was not made until after the filing of the instant lawsuit, after Ms. Amaral, in the face of an express threat to withdraw the volume and 24-hour rent credits pursuant to the September 15th letter, rejected through her

18

counsel Drake's offer to settle the instant litigation, and just two weeks after Mr. Potter testified at his deposition that Drake would sell the Station to Arista unless Ms. Amaral agreed to Drake's terms;

(viii)    The decision was made to accomplish business purposes not permitted by the PMPA, i.e. to discriminate against Ms. Amaral, retaliate against her for the filing of the instant lawsuit, deprive of her of a source of income with which to litigate her claims against Drake, and deprive her of her reasonable expectation of renewal of her franchise and continuation of the franchise relationship, or, in the event of a sale, of her reasonable expectation of being offered the Station at a fair price;

(ix)    The decision to offer a third-party the option to purchase the Marketing Premises was at variance with Drake's customary practice of first offering to sell locations identified for divestment to the current lessee dealers;

(x)    The inclusion by Drake as a special condition in the June Option to Purchase of a requirement that the buyer, in the event of a future sale, place a deed restriction on the property prohibiting any future sale of gasoline from the property was intended solely to prevent Ms. Amaral, were she to exercise her right of first refusal, from selling her business as a going concern to a third-party and/or from selling the property for continued use as gasoline service station.

(xi)    The June Option to Purchase is not a bona fide offer to purchase because, by its terms, it reserves to Arista the option to terminate the agreement at any time; and

(xii)    Drake set a price for the Marketing Premises which improperly included a premium above its fair market value as a gasoline service station in order to compensate Drake for the loss of profits it would have realized had it been able to continue selling gasoline to the buyer.

70.    Drake has violated its obligations under §2802(b)(3)(D)(iii) of the PMPA in at least the following respects:

(i)    It has failed during the 90-day period *after* notification of non-renewal to make a bona fide offer to sell to Ms. Amaral Drake's interest in the Marketing Premises;

19

(ii)     It has failed during the 90-day period *after* notification of non-renewal to offer Ms. Amaral a right of first refusal of at least 45 days duration of an offer made by another;

(iii)    The June Option to Purchase does not constitute a bona fide offer to purchase Drake's interest in the Marketing Premises triggering Drake's obligation to offer Ms. Amaral a right of first refusal because it only binds Drake to sell the property and does not contain an unconditional and binding promise by Arista to purchase the property;

(iv)     Drake has failed to make a bona fide offer to sell to Ms. Amaral equipment necessary for continued operation as a gasoline service station because the June Option to Purchase reserves to Drake the right, at its option, to remove all fixtures and equipment from the Marketing Premises prior to closing; and

(v)      Drake demanded a price from Arista which it knew was substantially in excess of the fair market value of the Marketing Premises for continued use for the sale of motor fuel, and which it knew Ms. Amaral would be unable to meet, thus intentionally depriving her of her reasonable expectation of being to purchase the Marketing Premises for fair market value.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiff Marnie J. Amaral requests that this Court:

A.     Issue a preliminary injunction and thereafter a permanent injunction ordering

Drake Petroleum Company, Inc. and its respective officers, agents, servants, employees, and

attorneys, and those persons in active concert or participation with them, to:

(1)     refrain from interfering with, altering, or discontinuing in any manner the normal and usual business arrangements which Ms. Amaral has enjoyed under the PMPA Franchise Agreement dated May 11, 2000;

(2)     Negotiate in good faith over the terms of a new franchise agreement and thereafter present to Ms. Amaral a Lease and Dealer Sales Contract which continue the franchise and franchise

20

relationship between the parties within the meaning of Section
2801(1)(A), (B)(i), (ii) and (2) of the PMPA and do not require
Ms. Amaral to waive any substantive or procedural right granted
franchisees under the PMPA and state law.

B.     Issue a preliminary injunction and thereafter a permanent injunction ordering
Drake Petroleum Company, Inc. and its respective officers, agents, servants, employees, and
attorneys, and those persons in active concert or participation with them, to:

(1)     Continue providing Ms. Amaral a $1,500 rent rebate for operating
the Station 24 hours per day and a volume rent credit of $.05 per
gallon from gallon one;

(2)     Continue providing Ms. Amaral monthly Rent Calculation
Worksheets reflecting deductions of the $1,500 24-hour rent
rebate, the $.05 per gallon rent credit, the amount collected under
the gallonage collection program and the net rent to be drafted
from her account on the fifteenth day of the following month;

(3)     Draft from Ms. Amaral's account, in full satisfaction of her rent
obligation, only the net rent specified on the monthly Rent
Calculation Worksheets;

(4)     Charge Ms. Amaral a price for motor fuel equal to Mobil's price to
Drake at the Providence rack, less any applicable discounts, plus
three cents per gallon, plus the actual cost of delivery from the
Providence rack to the Station.

C.    Declare and adjudge that:

(1)    The changes or additions proposed by Drake to the franchise in the March and November Leases and Dealer Sales Contracts were not the result of determinations made by Drake in good faith and in the normal course of its business and that any failure by Ms. Amaral to agree to such changes or additions would not provide grounds for nonrenewal of the franchise relationship between the parties in accordance with Section 2802(b)(3)(A)(i) of the PMPA; and/or

(2)    The changes or additions proposed by Drake to the franchise in the March and November Leases and Dealer Sales Contracts are for the purpose of converting the leased Marketing Premises to operation by Drake employees or agents for Drake's benefit, or otherwise preventing the renewal of the franchise relationship, and thus preclude nonrenewal of the franchise relationship for failure to agree under Section 2802(b)(3)(A)(ii) of the PMPA; and/or

(3)    The November Lease and Dealer Sales Contract, if executed, would not result in renewal of a "franchise" and/or "franchise relationship" within the meaning of the PMPA, but would instead result in constructive nonrenewal of the franchise relationship in violation of Sections 2802(a)(2) and 2805(f)(1) of the PMPA; and/or

(4)    Paragraph 17(a) (vii) of the November Lease, which renders any failure to operate the convenience store on the leased premises for more than twenty-four consecutive hours or forty-eight hours

22

during any twelve month period a default of the Lease, violates Section 4A (a) of Chapter 93E;

(5)     Drake's non-renewal of Ms. Amaral's franchise was not in good faith and in the normal course of its business, and therefore violated Section 2802(b)(2)(3)(D)(i)(III) of the PMPA;

(6)     Drake violated its obligations under Section 2802(b)(2)(3)(D)(iii) of the PMPA in that it failed, during the 90- day period after notification of non-renewal was given, to either make Ms. Amaral a bona fide offer to sell, transfer, or assign to Ms. Amaral Drake's interests in the Marketing Premises, and/or offer Ms. Amaral a right of first refusal of at least 45 days duration of an offer, made by another, to purchase Drake's interest in the Marketing Premises.

D.     Enter judgment declaring that Drake has committed material breaches of the 1993, 1997 and 2000 PMPA Franchise Agreements;

E.     Enter judgment declaring that Drake has breached the covenants of good faith and fair dealing implied in the 1993, 1997 and 2000 PMPA Franchise Agreements;

F.     Enter judgment declaring that Drake has violated the open price term of M.G.L. c.106, §2-305(3).

G.     Enter judgment declaring that Drake has engaged in unfair and/or deceptive trade practices in willful and knowing violation of M.G.L. c.93A, §11;

H.     Enter judgment declaring that Drake has violated the provisions of the PMPA, 15 U.S.C. §2801 et. seq.

I.     Award Ms. Amaral the actual damages she has suffered as a result of Drake's material breaches of the 1993, 1997 and 2000 PMPA Franchise Agreements;

23

J.      Award Ms. Amaral the actual damages she has suffered as a result of Drake's

material breaches of the covenants of good faith and fair dealing implied in the 1993, 1997 and

2000 PMPA Franchise Agreements;

K.      Award Ms. Amaral the actual damages she has suffered as a result of Drake's

violation of the open price term of M.G.L. c.106, §2-305(3).

L.      Award Ms. Amaral three times the actual damages she has suffered as a result of

Drake's willful and knowing violations of M.G.L. c.93A, §11, plus reasonable attorney's fees;

M.      Award Ms. Amaral actual and exemplary damages for Drake's violations of the

PMPA, plus reasonable attorney's and expert witness fees.

N.      Award Ms. Amaral the costs of this action; and

O.      Grant such other different and further relief as the Court deems appropriate.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES
THAT ARE TRIABLE BY JURY AS A MATTER OF RIGHT

MARNIE J. AMARAL
By her attorney,

_____

Lindsey Marie Straus, Esquire
 BBO #554181
Law Office of Lindsey M. Straus
1583 Main Street
Brewster, MA 02631
(508) 896-8008

Dated:

24

## CERTIFICATE OF SERVICE

I, Lindsey M. Straus, hereby certify that on this date I served the above-captioned document by e-mailing a copy and sending a hard copy, postage pre-paid, to Brian A. O'Connell, Zizik, Powers, O'Connell, Spaulding & Lamontagne, P.C., One Hollis Street, Suite 400, Wellesley, MA 02482.

Dated:

_____
Lindsey Marie Straus, Esq.

Mar 14 05 02:27p     Michael W. Frisbie          413-567-6206          p.2

Exhibit M



6/1/05
DEPOSITION
EXHIBIT
22

Arista Development, LLC
PO Box 470
North Attleboro, Massachusetts 02761
(508) 643-7000
(508) 643-7136 (facsimile)

March 14, 2005

**VIA ELECTRONIC MAIL**

Mike Frisbie
Hunter Development, LLC
1083 Frank Smith Road
Longmeadow, MA 01106

Re:     Property at 328 Rhode Island Avenue
        Fall River, Massachusetts

Dear Mike:

In accordance with our discussion, I am pleased to present to you for your presentation to the Seller for their review and consideration, this revised letter as an Offer to Purchase ("Offer") the Property as defined in Section 3 below. Upon its acceptance by the Seller, we shall seek to enter into a mutually satisfactory Purchase and Sale Agreement (the "Agreement").

I am prepared to move forward to the preparation of a more formal Agreement based on the following terms and conditions:

1. Buyer:          Arista Development, LLC, or its nominee/assignee

2. Seller:         Drake Petroleum Co., Inc. (or Owner of Record)

3. Property:       A parcel of land totaling approximately 35,018 square feet in size together will all
                   buildings and improvements located thereon as shown on the attached plan (if any)
                   and as more particularly shown on the City of Fall River tax map as Map E Parcel
                   45 & 46. The Property is currently zoned commercial

4. Purchase Price: We shall pay at closing a total purchase price of One Million Nine Hundred
                   Twenty Five Thousand Dollars ($1,925,000).

5. Deposit:        Buyer shall deposit with Buyer's counsel a Deposit to be held in escrow in the
                   amount of Twenty Thousand Dollars ($20,000) upon the execution of a mutually
                   satisfactory Agreement. Said Deposit shall be refundable pursuant to the terms of
                   this Offer and the Agreement.

Real Estate Development and Investment

Mike Frisbie
Page 2 of 3
March 14, 2005

6. Review Period:    Buyer shall have a period of One Hundred Days (100) to complete its due diligence review of the property including, but not limited to review of current zoning, title, survey, engineering, environmental, hazardous materials, permitting and approval process and other matters that Buyer's deems is appropriate for the intended use of the Property. Buyer shall have access to the Property to conduct its review. If Buyer is not satisfied in its sole discretion with the results of its review of the Property, Buyer shall notify Seller prior to the end of the Review Period and the Deposit shall be immediately returned to Buyer.

7. Permitting Period:    Seller understands that Buyer is contemplating a redevelopment of the Property and as such must seek and obtain permits and approvals for Buyer's intended use. Provided Buyer is satisfied with the results of its review of the property, Buyer, commencing upon the expiration of the Review Period, shall have a period of Two Hundred Ten Days (210) to apply for and obtain all necessary local, state and if required federal permits and approvals, including building permits, for Buyer's intended use. Buyer shall be responsible for any and all costs in applying for and obtaining all permits and approvals. If in the sole opinion of Buyer it is unable to obtain its permits and approvals for its intended use with conditions acceptable to Buyer, in its sole discretion, Buyer may terminate the Agreement at any time and all Deposits shall be returned to Buyer. During the Permitting Period Buyer shall pay to Seller monthly non-refundable but applicable payments of $1,000 per month.

8. Conditions of
Closing:
1.    Subject property must have good clear record and marketable title.
2.    Subject property must be delivered free and clear of any and all tenants.
3.    Buyer shall be satisfied with environmental reports indicating a site sufficient for Buyer's intended use.

9. Options to Extend:    Provided Buyer has applied for and is in the process of obtaining its permits and approvals for its intended use, Buyer shall have the option to extend the Permitting Period for two (2) ninety (90) day periods. Each extension period shall be accompanied by a payment to Seller in the amount of $5,000. Each payment shall be non-refundable but shall be applied to the Purchase Price at Closing.

10. Closing:    Closing will take place no later than 30 days of Buyer obtaining all its permits and approvals with all appeal periods having expired.

11. Broker:    None.

Real Estate Development and Investment

Mike Frisbie
Page 3 of 3
March 14, 2005

12. Special Conditions:

    a) Seller shall remove all equipment from the Property prior to closing. All equipment
       shall remain the property of Seller.
    b) Buyer acknowledges that the current gas station operator has the right of first refusal to
       purchase the Property pursuant to a separate agreement between Seller and operator.
    c) Buyer agrees to place a deed restriction on property restricting any future sale of
       gasoline from the Property.

Upon acceptance of this Offer and signing below, Buyer and Seller, for nominal, non-monetary consideration, the
receipt of which is hereby acknowledged, acknowledge that this agreement is considered to be a binding agreement
between the parties. Buyer will, within ten (10) business days from the execution of this agreement, prepare a
Purchase and Sale Agreement and forward it to Seller. Buyer and Seller agree to negotiate the Purchase and Sale
Agreement in good faith

This Offer and the information contained herein is intended to be confidential and shall not be disclosed to any third
parties unless such third parties are acting in an advisory capacity in the sale of the Property to either Buyer or
Seller.

Time is of the essence. If this Offer is acceptable please indicate so by signing in the space provided for below. This
Offer expires at 5:00 PM on March 25, 2005.

Thank you for your time and consideration. If you should have any questions or comments please feel free to
contact me directly.

Sincerely,
Arista Development, LLC

s/Scott A. Weymouth

Scott A. Weymouth
Principal

Agreed to and accepted this ___ day of _____, 2005.

_____

Name:
Title:

Real Estate Development and Investment

Case 1:05-cv-11778-DPW    Document 5-2    Filed 09/08/2005    Page 6 of 35
JUN-20-2005 MON 02:51 PM WARREN EQUITIES LAW DEPT      FAX NO. 1 781 245 9001        P. 02

Jun 20 05 10:58a      ARISTA DEVELOPMENT, LLC      (508) 643-7138      p.2

Exhibit N

Arista Development, LLC
PO Box 470
North Attleboro, Massachusetts 02761
(508) 643-7000
(508) 643-7136 (facsimile)

June 7, 2005

**VIA ELECTRONIC MAIL**

Mike Frisbie
Hunter Development, LLC
45 Old Farm Road
East Longmeadow, MA 01028

Re:      Property at 408 Rhode Island Avenue
          Fall River, Massachusetts

Dear Mike:

In accordance with our discussion, I am pleased to present to you for your presentation to the Seller for their review and consideration, this revised letter as an Offer to Purchase ("Offer") the Property as defined in Section 3 below. Upon its acceptance by the Seller, we shall seek to enter into a mutually satisfactory Purchase and Sale Agreement (the "Agreement").

I am prepared to move forward to the preparation of a more formal Agreement based on the following terms and conditions:

| | |
|---|---|
| 1. Buyer: | Arista Development, LLC, or its nominee/assignee |
| 2. Seller: | Drake Petroleum Co., Inc. (or Owner of Record) |
| 3. Property: | A parcel of land totaling approximately 35,018 square feet in size together will all buildings and improvements located thereon as shown on the attached plan (if any) and as more particularly shown on the City of Fall River tax map as Map E Parcel 45 & 46. The Property is currently zoned commercial |
| 4. Purchase Price: | We shall pay at closing a total purchase price of One Million Nine Hundred Twenty Five Thousand Dollars ($1,925,000). |
| 5. Deposit: | Buyer shall deposit with Buyer's counsel a Deposit to be held in escrow in the amount of Twenty Thousand Dollars ($20,000) upon the execution of a mutually satisfactory Agreement. Said Deposit shall be refundable pursuant to the terms of this Offer and the Agreement. |

Real Estate Development and Investment

Mike Frisbie
Page 2 of 3
June 7, 2005

6. Review Period:

Buyer shall have a period of One Hundred Days (100) to complete its due diligence review of the property including but not limited to review of current zoning, title, survey, engineering, environmental, hazardous materials, permitting and approval process and other matters that Buyer's deems is appropriate for the intended use of the Property. Buyer shall have access to the Property to conduct its review. If Buyer is not satisfied in its sole discretion with the results of its review of the Property, Buyer shall notify Seller prior to the end of the Review Period and the Deposit shall be immediately returned to Buyer.

7. Permitting Period:

Seller understands that Buyer is contemplating a redevelopment of the Property and as such must seek and obtain permits and approvals for Buyer's intended use. Provided Buyer is satisfied with the results of its review of the property, Buyer, commencing upon the expiration of the Review Period, shall have a period of Two Hundred Ten Days (210) to apply for and obtain all necessary local, state and if required federal permits and approvals, including building permits, for Buyer's intended use. Buyer shall be responsible for any and all costs in applying for and obtaining all permits and approvals. If in the sole opinion of Buyer it is unable to obtain its permits and approvals for its intended use with conditions acceptable to Buyer, in its sole discretion, Buyer may terminate the Agreement at any time and all Deposits shall be returned to Buyer. During the Permitting Period Buyer shall pay to Seller monthly non-refundable but applicable payments of $1,000 per month.

8. Conditions of
Closing:

1.    Subject property must have good clear record and marketable title.
2.    Subject property must be delivered free and clear of any and all tenants.
3.    Buyer shall be satisfied with environmental reports indicating a site sufficient for Buyer's intended use.

9. Options to Extend:

Provided Buyer has applied for and is in the process of obtaining its permits and approvals for its intended use, Buyer shall have the option to extend the Permitting Period for two (2) ninety (90) day periods. Each extension period shall be accompanied by a payment to Seller in the amount of $5,000. Each payment shall be non-refundable but shall be applied to the Purchase Price at Closing.

10. Closing:

Closing will take place no later than 30 days of Buyer obtaining all its permits and approvals with all appeal periods having expired, and all conditions have been met or waived.

11. Broker:

None.

Real Estate Development and Investment

Mike Frisbie
Page 3 of 3
June 7, 2005

12. Special Conditions:

    a) Seller shall have the right however not the obligation to remove all fixtures and equipment from the Property prior to closing.

    b) Buyer acknowledges that the current gas station operator has the right of first refusal to purchase the Property pursuant to a separate agreement between Seller and operator.

    c) Buyer agrees to place a deed restriction on property restricting any future sale of gasoline from the Property.

    d) Subject to lawful termination of the current petroleum franchise and petroleum franchise relationship at the site, except that Seller is not obligated to engage in any litigation involving an attempt to obtain such termination, or to continue with same.

Upon acceptance of this Offer and signing below, Buyer and Seller, for nominal, non-monetary consideration, the receipt of which is hereby acknowledged, acknowledge that this agreement is considered to be a binding agreement between the parties. Buyer will, within thirty (30) business days from the execution of this agreement, prepare a Purchase and Sale Agreement and forward it to Seller, Buyer and Seller agree to negotiate a mutually acceptable Purchase and Sale Agreement in good faith

This Offer and the information contained herein is intended to be confidential and shall not be disclosed to any third parties unless such third parties are acting in an advisory capacity in the sale of the Property to either Buyer or Seller or as may be required to comply with Sec. 12(b) and (d) above or as required by law.

Time is of the essence. If this Offer is acceptable please indicate so by signing in the space provided for below, This Offer expires at 5:00 PM on June 17th, 2005.

Thank you for your time and consideration. If you should have any questions or comments please feel free to contact me directly.

Sincerely,
Arista Development, LLC

s/Scott A. Weymouth

Scott A. Weymouth
Principal

Agreed to and accepted this 17 day of _____ , 2005.

Name:

Real Estate Development and Investment

FROM :                          FAX NO. :                    Nov. 27 2002 12:13PM  P1

*Exhibit O*

**DRAKE PETROLEUM COMPANY, INC.** /221 QUINEBAUG ROAD (RTE. 131), NORTH GROSVENORDALE, CT 06255 • (860) 935-5800 • FAX (860) 935-9396

DAVID M. PREBLE
PRESIDENT

July 1, 2005

CERTIFIED MAIL NO. 7003 3110 0001 4809 3684

Ms. Marnie J. Amaral
488 Howes Street
New Bedford, MA 02745

**RE:  Notice of Non-Renewal of Franchise/Franchise
      Relationship Under 15 U.S.C. Sec 2804; and Offer of
      Right of First Refusal Under 15 U.S.C. Sec. 2802
      (D)(iii)(II)**

Dear Ms. Amaral:

     As you know, Drake Petroleum Company, Inc.
("Franchisor") owns the gasoline station premises located
at 408 Rhode Island Avenue, Fall River, Massachusetts
("Premises") which you occupy and operate as the
Tenant/Dealer Franchisee of the Franchisor under the
Petroleum Market Practices Act ("PMPA").

     A.   Notice of Non-Renewal

     Franchisor has received an offer made by another
person to purchase Franchisor's interest in the Premises,
and Franchisor has accepted that offer ("Offer").
Accordingly, Franchisor hereby notifies you that because of
its decision in the normal course of business to sell the
Premises, Franchisor does not intend to renew the
franchise/franchise relationship between you and Franchisor
with respect to the Premises or otherwise, and that such
non-renewal shall take effect on November 1, 2005.

     A copy of a summary of your rights as Franchisee under
PMPA is attached to this notice.

B.    Offer of First Refusal

Attached is a copy of the fully executed Offer. Accordingly, pursuant to 15 U.S.C. Sec. 2802(D)(iii)(II), Franchisor hereby offers you as Franchisee at the Premises a right of first refusal with respect to the Offer.  Please note that your said right of first refusal will remain in effect through September 1, 2005, but if not exercised on or before that date shall thereafter be of no further force or effect.

In order to exercise your right of first refusal you must on or before said date send to me at the address printed on this letterhead a letter by United States certified mail, postage prepaid, stating that pursuant to your right of first refusal you agree to purchase the Premises on the same terms that are stated in the Offer, a copy of which is attached.

If you have any questions about the foregoing, please contact me at your convenience at (800) 243-6366 (extension 2355) or Gary Plumer at extension 2462.

                         DRAKE PETROLEUM COMPANY, INC.


                         By: _____
                              Peter Potter
                              Vice President

Enclosures
SWVwsserstanand

1 of 100 DOCUMENTS

FEDERAL REGISTER

Vol. 61, No. 123

Notices

DEPARTMENT OF ENERGY (DOE)

**Revised Summary of Title I of the Petroleum Marketing Practices Act**

*61 FR 32786*

**DATE:** Tuesday, June 25, 1996

**ACTION:** Notice.

--------------------------------------------------------------------------------
To view the next page, type .np* TRANSMIT.
To view a specific page, transmit p* and the page number, e.g. p*1
--------------------------------------------------------------------------------

[*32786]

**SUMMARY:** This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the **Federal Register** a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

**FOR FURTHER INFORMATION CONTACT:** Carmen Difiglio, Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Lawrence Leiken, Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

**SUPPLEMENTARY INFORMATION:** Title I of the Petroleum Marketing Practices Act, as amended, *15 U.S.C. § § 2801*-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

61 FR 32786, *

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the **Federal Register** a simple and concise summary of the provisions of Title I, including a statement of the respective [*32787] responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the **Federal Register** on August 30, 1978. *43 F.R. 38743 (1978).*

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. *See* H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. *Id.*

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

### Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), *15 U.S.C. § § 2801*-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

61 FR 32786, *

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 *(15 U.S.C. § § 2801-*2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

### I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

#### A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 [*32788] days, before you receive notification of the termination.

#### B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

#### C. Mutual Agreement To Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

#### D. Withdrawal From the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. *See 15 U.S.C. § 2802*(b)(E).

#### E. Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

## II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

### A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

### B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

### C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises. [*32789]

### III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

### A. How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

### B. Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:

(1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;

(2) The date the termination or non-renewal takes effect; and

(3) A copy of this summary.

### IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

### A. Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in

writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### B. Interim Franchises

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. *15 U.S.C. § § 2801*-2806.

### VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

### Further Discussion of Title I--Definitions and Legal Remedies

### I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

### A. Franchise

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale,

consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a [*32790] trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

### B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

### C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

### F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

### G. Fail to Renew and Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

## II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

### A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

### B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.



61 FR 32786, *

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

### C. Burden of Proof

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

### D. Damages

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

### E. Franchisor's Defense to Permanent Injunctive Relief

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;

(2) To materially alter, add to, or replace such premises;

(3) To sell such premises;

(4) To withdraw from marketing activities in the geographic area in which such premises are located; or

(5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.

**Marc W. Chupka,**

*Acting Assistant Secretary for Policy.*

[FR Doc. 96-16124 Filed 6-24-96; 8:45 am]

BILLING CODE 6450-01-P

4673 words

**Law Office of Lindsey Marie Straus**
**114 Harwich Road (Rt. 124)**
**Brewster, MA 02631**
**508.896.8008 (office)**
**617.249.1674 (fax)**
**lindsey@lindseystrauslaw.com**

August 15, 2005

Marc J. Santos
Clerk of Courts
Bristol County Superior Court
9 Court Street
Room 13
Taunton, MA 02780

Re:    Amaral v. Drake Petroleum Company, Inc.
       Civil Docket No. BRCV2004-01354C

Dear Sir or Madam:

I understand after speaking with opposing counsel that you have returned the Amended Complaint I sent you under cover of my letter of August 2, 2005 because it was not accompanied by a motion for leave to file.

While my reading of Rule 15(a) led me to believe that I could file the First Amended Complaint without the necessity of a motion because I had the written consent of the adverse party, I am happy to provide you an assented-to motion for leave to file.

Therefore, enclosed please find the following:

1. First Amended Complaint; and
2. Assented-To Motion For Leave To File First Amended Complaint.

If you have any questions, please call.

Thank you.

Very truly yours,

Lindsey M. Straus, Esq.

cc:    Marnie J. Amaral
       Brian A. O'Connell, Esq.

# ZIZIK, POWERS, O'CONNELL, SPAULDING & LAMONTAGNE

### A PROFESSIONAL CORPORATION
### ATTORNEYS AND COUNSELORS AT LAW

ONE HOLLIS STREET, SUITE 400
WELLESLEY, MA 02482-4673

**BRIAN A. O'CONNELL**

TELEPHONE (781) 263-0202
FACSIMILE (781) 431-8749
EMAIL: boconnell@zizikpowers.com

Providence
Boston
Cape Cod (Falmouth)

July 29, 2005

Via Email
And First Class Mail
Lindsey Straus, Esq.
Law Office of Lindsey M. Straus
1583 Main Street
Brewster, MA 02631

Re:    Marnie J. Amaral d/b/a M & E Mobil v. Drake Petroleum Company, Inc.
Bristol, SS.; C.A. No. BRCV2004-01354-C

Location: 408 Rhode Island Avenue, Fall River, MA

Dear Attorney Straus:

As we discussed, you have my assent to file the Amended Complaint in this matter.

If you need anything else on this issue or if you have any questions or comments, please do not hesitate to contact me.

Very truly yours,

/s/

Brian A. O'Connell

BAO/krg
DPC/Amaral/6752

**Commonwealth of Massachusetts**
**County of Bristol**
**The Superior Court**

Civil Docket **BRCV2004-01354**

RE:    Amaral v Drake Petroleum Company, Inc.

TO:    FILE COPY

### CLERK'S NOTICE

This is to notify you that in the above referenced case the Court's action on **8/17/2005**:

*RE: Plaintiff Marnie J. Amaral's MOTION for Leave to file first Amended Complaint, assented to*

**is as follows:**

**Plaintiff's motion #4: to amend complaint (assented to), there being no opposition on file pursuant to MA Superior Court Rule 9A (indeed assent indicated), this motion is ALLOWED.**

**(Moses, J.)**

Dated at Taunton, Massachusetts this 17th day of August, 2005.

Marc J. Santos,
Clerk of the Courts

BY:

Philip F. Leddy
Assistant Clerk

Telephone: (508) 823-6588

Copies mailed 8/17/2005

A True Copy By Photostatic Process
Attest

*Asst. Clerk of Courts*

cvdresult_2.wpd 469129 motallow leddyphi

4.

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.

BRISTOL, SS SUPERIOR COURT

FILED

AUG 1 6 2005

MARC J. SANTOS
CLERK

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
BRISTOL DIVISION
CIVIL ACTION NO. BRCV2004-
01354-C

MARNIE J. AMARAL d/b/a M & E MOBIL
Plaintiff,

v.

DRAKE PETROLEUM COMPANY, INC.

Defendant

ASSENTED-TO MOTION FOR
LEAVE TO FILE FIRST
AMENDED COMPLAINT

Plaintiff, Marnie J. Amaral, pursuant to Mass. R. Civ. P. 15(a), hereby moves for leave to file the attached First Amended Complaint, to which filing counsel for defendant Drake Petroleum Company, Inc. has given his written consent as reflected in the attached letter dated July 29, 2005.

*There being no opposition on file pursuant to MA Sup Ct Rule 9A (indeed assent indicated), this motion is ALLOWED.
(Moses, J.) August 17, 2005*

*Asst. Clerk*

Dated: *August 15, 2005*

MARNIE J. AMARAL
By her attorney,

Lindsey Marie Straus, Esquire
BBO #554181
Law Office of Lindsey M. Straus
114 Harwich Road
Brewster, MA 02631
(508) 896-8008

A True Copy By Photostatic Process
Attest:

Asst. Clerk of Courts

## CERTIFICATE OF SERVICE

I, Lindsey M. Straus, hereby certify that on this date I served the above-captioned document by e-mailing a copy and sending a hard copy, postage pre-paid, to Brian A. O'Connell, Zizik, Powers, O'Connell, Spaulding & Lamontagne, P.C., One Hollis Street, Suite 400, Wellesley, MA 02482.

Dated: August 15, 2005

Lindsey Marie Straus, Esq.

2

COMMOMWEALTH OF MASSACHUSETTS

BRISTOL, SS.

SUPERIOR COURT DEPARTMENT OF THE
TRIAL COURT
BRISTOL DIVISION
C.A. NO.: BRCV2004-01354-C



BRISTOL, SS SUPERIOR COURT
FILED

JAN 1   2015

MARC L. SANTOS, ESQ.
CLERK/MAGISTRATE

MARNIE J. AMARAL D/B/A
M & E MOBIL

    Plaintiff

v.

DRAKE PETROLEUM COMPANY, INC.

    Defendant.

## DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendant, Drake petroleum Company, Inc. ("Drake") hereby makes this its answer to

plaintiff's complaint.

## NATURE AND BASIS OF ACTION

1.    The defendant denies the allegations contained in paragraph 1.

## PARTIES

2.    The defendant is without knowledge or information sufficient to form a belief as
to the truth of the allegations contained in paragraph 2 and calls upon the plaintiff to prove the
same.

3.    The defendant admits the allegations contained in paragraph 4.

## FACTUAL ALLEGATIONS

4.    The defendant is without knowledge or information sufficient to form a belief as
to the truth of the allegations contained in paragraph 4 and calls upon the plaintiff to prove the
same.

A True Copy By Photostatic Process
Attest:

Asst. Clerk of Courts

5.      The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 5 and calls upon the plaintiff to prove the same.

6.      The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 6 and calls upon the plaintiff to prove the same.

7.      The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 7 and calls upon the plaintiff to prove the same.

8.      The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 8 and calls upon the plaintiff to prove the same.

9.      The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 9 and calls upon the plaintiff to prove the same.

10.     The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 10 and calls upon the plaintiff to prove the same.

11.     The defendant is without knowledge or information sufficient to form a belief as

to the truth of the allegations contained in paragraph 11 and calls upon the plaintiff to prove the

same.

12.     The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 and calls upon the plaintiff to prove the same.

13.     The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 and calls upon the plaintiff to prove the same.

14.     The defendant denies the allegations contained in paragraph 14.

15.     The defendant admits the allegations contained in paragraph 15.

16.     The defendant admits the allegations contained in paragraph 16.

17. The defendant admits the allegations contained in paragraph 17.

18. The defendant admits the allegations contained in paragraph 18.

19. The defendant admits the allegations contained in paragraph 19.

20. The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20 and calls upon the plaintiff to prove the same.

21. The defendant admits the allegations contained in paragraph 21.

22. The defendant admits the allegations contained in paragraph 22.

23. a. Defendant admits that the proposed March lease, which the parties did not agree upon, contains language to this effect, but that was not defendant's intent. This provision of the proposed lease is not relevant.

   b. Defendant admits that the proposed March lease, which the parties did not agree upon, contains language to this effect, but that was not defendant's intent. This provision of the proposed lease is not relevant.

   c. Defendant admits that the proposed March lease, which the parties did not agree upon, contains language to this effect, but that was not defendant's intent. This provision of the proposed lease is not relevant.

   d. Defendant admits that the proposed March lease, which the parties did not agree upon, contains language to this effect, but that was not defendant's intent. This provision of the proposed lease is not relevant.

   e. Defendant admits that the proposed March lease, which the parties did not agree upon, contains language to this effect, but that was not defendant's intent. This provision of the proposed lease is not relevant.

   f. Defendant admits that the proposed March lease, which the parties did not agree upon, contains language to this effect, but that was not defendant's intent. This provision of the proposed lease is not relevant.

   g. The defendant admits the allegations contained in paragraph 23(g).

   h. The defendant admits the allegations contained in paragraph 23(h).

   i. The defendant admits the allegations contained in paragraph 23(i).

   j. The defendant denies the allegations contained in paragraph 23(j).

3

      k.     The defendant admits the allegations contained in paragraph 23(k).

      l.     The defendant admits the allegations contained in paragraph 23(l).

      m.    The defendant admits the allegations contained in paragraph 23(m).

      n.     The defendant admits the allegations contained in paragraph 23(n).

      o.     The defendant admits the allegations contained in paragraph 23(o).

24.    The defendant admits the allegations contained in paragraph 24.

25.    a.     The defendant admits the allegations contained in paragraph 25(a).

      b.     The defendant admits the allegations contained in paragraph 25(b).

      c.     The defendant admits the allegations contained in paragraph 25(c).

      d.     The defendant admits the allegations contained in paragraph 25(d).

      e.     The defendant admits the allegations contained in paragraph 25(e).

26.    The defendant admits the allegations contained in paragraph 26.

27.    The defendant admits that it sent Ms. Amaral Exhibit "I".

28.    The defendant denies the allegations contained in paragraph 28.

29.    The defendant denies the allegations contained in paragraph 29.

30.    The defendant denies the allegations contained in paragraph 30.

31.    The defendant denies the allegations contained in paragraph 31.

32.    Drake admits that Ms. Amaral's correspondence is attached to the complaint as Exhibit "J". Drake denies the substance of the allegations contained in Paragraph 32.

33.    The defendant admits the allegations contained in paragraph 33.

34.    The defendant admits the allegations contained in paragraph 34.

35.    a.     The defendant admits the allegations contained in paragraph 35(a).

      b.     The defendant admits the allegations contained in paragraph 35(b).

    c.    The defendant admits the allegations contained in paragraph 35(c).

    d.    The defendant admits the allegations contained in paragraph 35(d).

        i.    The defendant admits the allegations contained in paragraph 35(d)(i).

        ii.    The defendant admits the allegations contained in paragraph 35(d)(ii).

36.    The defendant denies the allegations contained in paragraph 36.

37.    The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 37 and calls upon the plaintiff to prove the same.

38.    The defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 38 and calls upon the plaintiff to prove the same.

39.    The defendant denies the allegations contained in paragraph 39.

40.    The defendant denies the allegations contained in paragraph 40.

41.    The defendant denies the allegations contained in paragraph 41.

42.    a.    The defendant denies the allegations contained in paragraph 43(a).

    b.    The defendant denies the allegations contained in paragraph 43(b).

    c.    The defendant denies the allegations contained in paragraph 43(b).

    d.    The defendant denies the allegations contained in paragraph 43(d).

    e.    The defendant denies the allegations contained in paragraph 43(e).

    f.    The defendant denies the allegations contained in paragraph 43(f).

    g.    The defendant denies the allegations contained in paragraph 43(g).

    h.    The defendant denies the allegations contained in paragraph 43(h).

    i.    The defendant denies the allegations contained in paragraph 43(i).

    j.    The defendant denies the allegations contained in paragraph 43(j).

    k.    The defendant denies the allegations contained in paragraph 43(k).

l.      The defendant denies the allegations contained in paragraph 43(l).

43.     The defendant denies the allegations contained in paragraph 43.

## COUNT I
### (Breach of Contract)

44.     The defendant repeats and realleges its responses to paragraphs 1 through 43 as fully set forth herein.

45.     The defendant denies the allegations contained in paragraph 45.

46.     The defendant denies the allegations contained in paragraph 46.

WHEREFORE, the defendant demands that the plaintiff's Complaint against it be dismissed and that judgment enter for the defendant together with its costs.

## COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

47.     The defendant repeats and realleges its responses to paragraphs 1 through 46 as fully set forth herein.

48.     The defendant denies the allegations contained in paragraph 48.

49.     The defendant denies the allegations contained in paragraph 49.

WHEREFORE, the defendant demands that the plaintiff's Complaint against it be dismissed and that judgment enter for the defendant together with its costs.

## COUNT III
### (Fraudulent Misrepresentation)

50.     The defendant repeats and realleges its responses to paragraphs 1 through 49 as fully set forth herein.

51.     The defendant denies the allegations contained in paragraph 51.

52.     The defendant denies the allegations contained in paragraph 52.

53.     The defendant denies the allegations contained in paragraph 53.

54.     The defendant denies the allegations contained in paragraph 54.

WHEREFORE, the defendant demands that the plaintiff's Complaint against it be dismissed and that judgment enter for the defendant together with its costs.

## COUNT V
## (M.G.L c. 93A, §11)

55.  The defendant repeats and realleges its responses to paragraphs 1 through 54 as fully set forth herein.

56.  The defendant denies the allegations contained in paragraph 56.

57.  The defendant denies the allegations contained in paragraph 57.

58.  The defendant denies the allegations contained in paragraph 58.

WHEREFORE, the defendant demands that the plaintiff's Complaint against it be dismissed and that judgment enter for the defendant together with its costs.

## AFFIRMATIVE DEFENSES

### SECOND DEFENSE

And further answering, the defendant says that the Complaint is barred by laches in that the defendant has been prejudiced by the excessive delay of the plaintiff in seeking the relief requested.

### THIRD DEFENSE

And further answering, the defendant says that the Complaint should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.

### FOURTH DEFENSE

And further answering, the defendant moves that the Complaint be dismissed insofar as the plaintiffs have participated in the transactions which gave rise to the relief sought by the plaintiffs.

### FIFTH DEFENSE

And further answering, the defendant says that the Complaint should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

### SIXTH DEFENSE

And further answering, the defendant says that the cause of action is barred by reason of the Statute of Limitations.

### SEVENTH DEFENSE

And further answering, the defendant moves that the Complaint be dismissed insofar as the plaintiffs have participated in the transactions which gave rise to the relief sought by the plaintiffs.

### EIGHTH DEFENSE

And further answering, the defendant says that if there were agreements between the parties, the debts have been satisfied.

### NINTH DEFENSE

And further answering, the defendant says that to the extent that it had any obligations to the plaintiff, such obligations have been fully, completely and properly performed in every respect.

### TENTH DEFENSE

And further answering, the plaintiff has failed to set forth the allegations regarding misrepresentation with the acquired specificity.

### JURY CLAIM

THE DEFENDANT CLAIMS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Defendant,
Drake Petroleum Company, Inc.
By Its Attorney

Brian A. O'Connell (BBO # 551182)
Zizik, Powers, O'Connell, Spaulding
& Lamontagne, P.C.
One Hollis Street, Suite 400
Wellesley, MA 02482
(781) 263-0202

### CERTIFICATE OF SERVICE

I, Brian A. O'Connell, hereby certify that on this 14th day of January, 2005, I served a copy of the foregoing on all parties to this action by mailing same, postage prepaid, to all counsel of record.

Brian A. O'Connell

8

# Commonwealth of Massachusetts
## County of Bristol
### The Superior Court

CIVIL DOCKET# **BRCV2004-01354**

RE: **Amaral v Drake Petroleum Company, Inc.**

TO:   FILE COPY



DEC - 8 2004

MARC J. SANTOS, ESQ.
CLERK/MAGISTRATE

## NOTICE OF COMPLAINT FILED UNDER CHAP. 93A

Enclosed is a copy of the Complaint in the above entitled action seeking relief pursuant to G.L. Chap. 93A, filed on **12/07/2004** in the Bristol Superior Court.

Dated at Taunton, Massachusetts this 8th day of December, 2004.

Marc J. Santos,
Clerk of the Courts

ENC.

Form #42

# COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS

BRISTOL, SS SUPERIOR COURT
FILED
[SEAL]
2004

MARC J. SANTOS, ESQ.
CLERK/MAGISTRATE

SUPERIOR COURT DEPT. OF THE TRIAL COURT

CIVIL ACTION

No. _BRCV2004-01354-C_

Marnie J. Amaral
d/b/a M&E Mobil _____, Plaintiff (s)

v.

Drake Petroleum Company, Inc ; Defendant(s)

(TO PLAINTIFF'S ATTORNEY :
PLEASE INDICATE TYPE OF ACTION INVOLVED :—
TORT — MOTOR VEHICLE TORT — CONTRACT —
EQUITABLE RELIEF — OTHER.)

### SUMMONS

To the Above-Named Defendant:

You are hereby summoned and required to serve upon _Lindsey Marie Straus, Esq._ plaintiff's attorney, whose address is _1593 Main Street, Brewster, MA 02631,_ an answer to the complaint which is herewith served upon you, within (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this Court at _Taunton_ either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13 (a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Hon. Barbara J. Rouse, Adm. Justice of the Superior Court Dept. of the Trial Court, at Taunton, the _Seventh_ day of _December_, in the year of our Lord two thousand and _Four_

_Marc J. Santos, Esq._

*Magistrate*

NOTICE TO DEFENDANT — You need not appear personally in Court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES.

1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. If the Commonwealth or an officer of agency thereof is a defendant, the time to be inserted is 60 days.

2SC 24





**Middlesex Sheriff's Office** • Civil Process Division, P.O. Box 7135, Lowell, MA 01852-0135 • (978) 452-3221

*Middlesex, ss.*

December 14, 2004

I hereby certify and return that on 12/13/2004 at 2:45PM I served a true and attested copy of the SUMMONS, COMPLAINT, COVER SHEET, REQUEST FOR THE PRODUCTION OF DOCUMENTS, INTERROGATORIES, EXHIBITS in this action in the following manner: To wit, by delivering in hand to NANCY KUBLIN, agent, person in charge at the time of service for DRAKE PETROLEUM COMPANY, INC., at SUITE 230, 20 MALL Road, WARREN EQUITIES, INC. Burlington, MA 01803. Attest ($5.00), Basic Service Fee ($30.00), Conveyance ($3.60), Postage and Handling ($1.00), Travel ($18.52) Total Charges $58.12

*Deputy Sheriff*

N.B.  TO PROCESS SERVER: —
PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN THIS
BOX ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.

12 / 13 , 2004.

**COMMONWEALTH OF MASSACHUSETTS**
**SUPERIOR COURT DEPT.**
OF THE TRIAL COURT
CIVIL ACTION
No.

BRISTOL, ss.

Marnie J. Amaral ............., Plaintiff (s)

v.

Drake Petroleum Company, Inc ..., Defendant (s)

**SUMMONS**
(Mass. R. CIV. P. 4)

A True Copy By Photostatic Process
Attest:

Asst. Clerk of Courts

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.

DEC - 7

MARC J. SANTOS, ESQ.
CLERK/MAGISTRATE

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
BRISTOL DIVISION
CIVIL ACTION NO. CO4-1384

MARNIE J. AMARAL d/b/a M & E MOBIL

Plaintiff,

v.

DRAKE PETROLEUM COMPANY, INC.

Defendant

COMPLAINT

A True Copy By Photostatic Process
Attest:

Asst. Clerk of Courts

## NATURE AND BASIS OF ACTION

1.      This is an action by a gasoline service station dealer against her supplier and lessor for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation, and unfair and deceptive trade practices in violation of M.G.L. c.93A, §11.

## PARTIES

2.      Plaintiff Marnie J. Amaral ("Ms. Amaral") lives in New Bedford, Bristol County, Massachusetts. Since 1988, she has operated a Mobil-brand gasoline station and convenience store on property located at 408 Rhode Island Avenue in Fall River ("Marketing Premises" or "the Station"). At all times relevant to this action, Ms. Amaral has been both a "franchisee" and "retailer" within the meaning of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801(4) and (7)("PMPA"), respectively.

3.      Defendant Drake Petroleum Company, Inc. ("Drake") is a Massachusetts corporation with a principal place of business at 221 Quinebaug Road, North Grosvenordale,

Connecticut. Drake is one of the largest independent distributors of gasoline and diesel in New

England. Among the major brands Drake distributes are Mobil, Texaco, Sunoco, Citgo, Gulf,

Getty and Exxon. At all times relevant to this action, Drake has been both a "franchisor" and

"distributor" within the meaning of Sections 2801(3) and (6) of the PMPA, respectively. It is not

a "refiner" within the meaning of Section 2801(5) of the PMPA.

FACTUAL ALLEGATIONS

4.     At all times relevant to this action, Mobil Oil Corporation ("Mobil") has been a

"refiner" within the meaning of Section 2801(5) of the PMPA.

5.     In 1988, Ms. Amaral and Mobil entered into a written contract establishing a

"franchise" and "franchise relationship" within the meaning of Section 2801(1) (A), (B)(i), (ii),

and (2) of the PMPA.

6.     In October 1990, Ms. Amaral and Mobil extended their franchise relationship for

an additional three –year term ending November 30, 1993.

7.     In or about June 1993, Mobil sent Ms. Amaral a letter stating that, effective

December 1, 1993, she would begin receiving a $1,500 monthly rent credit for operating the

Station on a 24-hour basis ("24-hour rent credit"). Mobil indicated that she would continue to

receive the 24-hour rent credit unless and until it was withdrawn by Mobil on 90 days' written

notice.

8.     By letter dated June 15, 1993, Mobil notified Ms. Amaral that, effective

December 1, 1993, her rent would be reduced by five cents for every gallon of gasoline she

purchased from Mobil ("Rent Reduction Letter"). The letter indicated Ms. Amaral would

continue to receive the credit unless and until it was withdrawn by Mobil on 90 days' written

notice. A true and correct copy of the Rent Reduction Letter is attached as **Exhibit A.**

2

9.      On or about October 22, 1993, Ms. Amaral and Mobil extended their franchise relationship for an additional three-year term ending November 30, 1996 ("1993 PMPA Franchise Agreement"). A true and correct copy of the 1993 PMPA Franchise Agreement is attached as **Exhibit B**.

10.     Under Article II, Paragraph A of the 1993 PMPA Franchise Agreement, Ms. Amaral was obligated to purchase from Mobil a minimum of 79,158 gallons per month and 1,143,100 gallons per year.

11.     Under Article II, Paragraph B of the 1993 PMPA Franchise Agreement, Mobil agreed to charge Ms. Amaral "prices [for motor fuel] in effect at time and place of delivery for that class of customer in which [Ms. Amaral] shall then fall, as determined by Mobil."

12.     Among other things, Article III, Paragraph D(1) of the 1993 PMPA Franchise Agreement (as amended by letter agreement dated October 18, 1993, a true correct copy of which is attached as **Exhibit C**) provided:

    (a)     for a nominal rent in years one to three of the contract of $110,300, $113,300 and $116,330 respectively;

    (b)     for collection of such rent on a "cents per gallon basis in such amount as determined by Mobil, upon delivery of each gallon of any motor fuel" to the Marketing Premises ("gallonage collection program"); and

    (c)     In the event "in any month ... the amount of rent collected [was] less than the rent due for the month," for Ms. Amaral to pay the deficiency to Mobil no later than the fifteenth day of the following month.

13.     Under Article III, Paragraph E of the 1993 PMPA Franchise Agreement, Mobil offered Ms. Amaral "the opportunity to participate in one or more rental reduction programs under which Dealer may pay a rental less than the contract rent specified in Paragraph D above," but reserved the "right to withdraw or modify any rental reduction program at any time [on] ... 90 days' advance written notice."

3

14.     On August 17, 1995, Drake entered into a written Distributor Agreement with Mobil authorizing Drake to purchase Mobil-brand motor fuel at wholesale (i.e. "rack") prices, and use Mobil's trademark in connection with the sale and distribution of such branded product at retail outlets operated by Drake employees, agents, licensees or affiliated companies, and to retail locations leased to Mobil-franchise dealers.

15.     At the same time, Drake purchased the Station from Mobil and took an assignment from Mobil of its rights and obligations under the 1993 PMPA Franchise Agreement, including Mobil's obligations as franchisor under the PMPA and its obligations under the Rent Reduction and 24-Hour Rent Letters.

16.     From August 17, 1995 to November 6, 1997, Ms. Amaral operated the Station pursuant to the 1993 PMPA Franchise Agreement assigned to Drake. Since that time, her franchise and franchise relationship with Drake have been extended twice, first by agreement dated November 6, 1997, and subsequently by agreement dated May 11, 2000 ("2000 PMPA Franchise Agreement"). Both incorporated, except as otherwise stated, the terms of the 1993 PMPA Franchise Agreement, including without limitation the pricing (Article II, Paragraph B) and rental reduction (Article III, Paragraph III) provisions. A true and correct copy of the 2000 PMPA Franchise Agreement is attached as **Exhibit D**.

17.     Like the 1993 and 1997 PMPA Franchise Agreements, the 2000 PMPA Franchise Agreement constitutes a "franchise" and establishes a "franchise relationship" within the meaning of Sections 2801(1) (A), (B) and (2) of the PMPA respectively.

18.     Since September 1995, Drake has issued Ms. Amaral invoices on the first day of each month for the full amount of the rent specified in the 1993, 1997 and 2000 PMPA Franchise Agreements. At the beginning of the following month, Drake has mailed Ms. Amaral Rent Calculation Worksheets reflecting: (a) the full contract rent for the previous month, (b) the

4

$1,500.00 24-hour rent credit, (c) the five cents per gallon rent credit, (d) the net rent due for the month after deducting the rent credits, (e) the amount of rent already received by Drake under the gallonage collection program (2.3 cents times monthly motor fuel purchases), and (f) the net rent deficiency to be drafted via electronic funds transfer from Ms. Amaral's business checking account on the fifteenth day of the month.  True and correct copies of representative monthly rent invoices and Rent Calculation Worksheets are attached as **Exhibits E** and **F** respectively.

19.     Based on the Rent Calculation Worksheets, Drake has drafted the net rent deficiency from Ms. Amaral's business checking account on the fifteenth day of each month.

20.     Ms. Amaral reasonably relied on the Rent Calculation Worksheets as setting forth the full amount of her rent obligation.

21.     On November 30, 2002, the 2000 PMPA Franchise Agreement expired but was extended pursuant to Article III, Section K of the 1993 PMPA Franchise Agreement.

22.     In March 2004, Drake offered Ms. Amaral a separate Lease and Dealer Sales Contract, true and correct copies of which are attached as **Exhibits G** ("March Lease") and **H** ("March Dealer Sales Contract") respectively.

23.     Among other things, the March Lease proposed to:

      a.     Lease to Ms. Amaral the *portion* of the Marketing Premises devoted to the operation of a convenience grocery store ("Leased Premises"), but *not* the portion devoted to the sale of motor fuel, including the pumps and underground storage tanks ("Adjacent Property").  March Lease, Preamble and ¶¶ 2, 35;

      b.     Reserve to Drake the right to operate a "motor fuels dispensing operation" on the Adjacent Property ("Motor Fuels Operation").  Id., ¶35;

      c.     Reserve to Drake the right during the term of the Lease, for any reason whatsoever, to "enter upon, remain on, and exit from the Leased Premises for the purpose of taking any actions [Drake] deemed necessary or appropriate in connection with the conduct of the Motor Fuels Operation, including without limitation, installing and operating cash registers or

5

computer consoles, and *depositing, withdrawing, and monitoring* receipts from sales from the Motor Fuels Operation. ..." Id. (emphasis supplied);

d.  Allow Ms. Amaral to "supervise the actual conduct" of the Motor Fuels Operation "so long as [she was] performing services with respect to the Motor Fuels Operation under the terms of the Dealer Sales Contract." Id.;

e.  Permit Drake "in the future [to] conduct the Motor Fuels Operation *without any participation by [Ms. Amaral],*" in which event Ms. Amaral would be required to operate the convenience store business in such a fashion as to not interfere with the Motor Fuels Operation, and Drake would have the right to install and maintain within the Leased Premises "*a separate cash register* for [Drake]'s cash and other receipts from sales from the Motor Fuels Operation. ..." Id. (emphasis supplied);

f.  Grant Drake the option to sell branded motor fuel for its own account on the Adjacent Property "subject to the terms and conditions of a franchise agreement with its branded supplier of motor fuels," in which case Ms. Amaral would be required to "comply with all requirements relating to the operation of the [Convenience Store] Business imposed upon [Drake] by its franchisor." Id., ¶36;

g.  Charge rent in the first year of $13,500 per month, an amount 23% more than the rent stated in the 2000 PMPA Franchise Agreement and approximately 250% more than the net monthly rent Ms. Amaral has been paying under that agreement after deduction of the 24-hour and volume rent credits. Id., ¶3(a);

h.  Discontinue all rent reduction programs, including the 24-hour and volume rent credits;

i.  Discontinue the gallonage collection program, requiring instead that Ms. Amaral pay the full monthly contract rent *in advance* on or before the first day of each month. Id.;

j.  Require Ms. Amaral, despite the fact that she was leasing only the convenience store building, to pay one hundred percent of the $17,000 annual real estate tax bill for the entire Property, taxes which had previously been paid entirely by Drake and included in the rent. Id., ¶¶ 4, 6;

k.  Allow Drake to terminate the Lease in the event the Leased Premises were so damaged or destroyed by fire or other casualty that such damage could not be repaired within 60 days, without being obligated, in the event the Station was subsequently rebuilt, to grant Ms. Amaral a right of first refusal of any franchise under which such premises were to be operated. Id., ¶9;

l.  Permit Drake to retain the entire proceeds received in the event all or part of the Leased Premises were taken by eminent domain, without being obligated to fairly apportion between Drake and Ms. Amaral the compensation, if any, received by Drake from the awarding authority based on any loss of business opportunity or good will.  Id., ¶ 10;

m.  Permit Drake to terminate the Lease for failure to operate the convenience store on the Leased Premises for more than twenty-four (24) consecutive hours or forty-eight (48) hours during any twelve month period.  Id., ¶17(a)(vii);

n.  Allow Drake, in the event of a default by Ms. Amaral, to immediately terminate the Lease without notice and immediately regain possession of the Leased Premises. Id., ¶17(b); and

o.  Require Ms. Amaral, on the last day of the term of the Lease, or upon earlier termination, to surrender possession of the Leased Premises to Drake.  Id., ¶19.

24.  Absent from the proposed March Lease are any references to Drake's Distributor Agreement with Mobil, or any provisions continuing Ms. Amaral's Mobil franchise, including the right to (a) use and occupy the portion of the Marketing Premises used in connection with the sale and distribution of Mobil-brand motor fuel under Mobil's trademarks, including the pumps and underground storage tanks; and (b) use Mobil's trademarks in connection with the sale and distribution of Mobil-brand motor fuel.

25.  Among other things, the March Dealer Sales Contract proposed to:

a.  Require Ms. Amaral to purchase from Drake "gasoline and/or any other motor fuels of all kinds, grades, *brands* and quality being sold by" Drake at the time of delivery.  March Dealer Sales Contract, ¶1 (emphasis supplied);

b.  Permit termination by Drake on the basis of a failure by Ms. Amaral to meet unspecified monthly or annual minimum product purchase requirements.  Id., ¶¶ 3, 7(f);

c.  Permit termination by Drake, in the event of default by Ms. Amaral, on 10 days written notice, reduced to 5 days for any default based on failure to pay sums due and owing. Id., ¶8;

7

d.    Reserve to Drake "the right without prior notice to change, *abolish*, remove, substitute, or alter any of" the trademarks adopted and used by Drake in its business. Id., ¶12 (emphasis supplied); and

e.    Establish a three-month contractual statute of limitations within Ms. Amaral would be required to institute suit based on a claim arising out of the Dealer Sales Contract. Id., ¶13.

26.    Despite the fact that Drake has not suffered the loss of the right to authorize Ms. Amaral to use the Mobil trademark and continues to be a Mobil distributor, the March Dealer Sales Contract, unlike the 1997 and 2000 PMPA Franchise Agreements, neither refers to Drake's Distributor Agreement with Mobil nor contains any provision authorizing Ms. Amaral to use the Mobil trademark in connection with the retail sale of motor fuel.

27.    When Ms. Amaral refused to sign the March Lease and Dealer Sales Contract, Drake sent her a letter dated September 15, 2004 in which it advised her that, effective January 1, 2005, it would reduce the $.05 per gallon rent rebate granted in the Rent Reduction Letter to $.02 per gallon and eliminate the $1,500.00 per month rebate for 24 hour operation "per Article III, Part E of the [1993 PMPA Franchise] Agreement." A true and correct copy of the September 15 letter is attached as **Exhibit I.**

28.    In a face-to-face meeting and numerous telephone conversations with Ms. Amaral about the March Lease and Dealer Sales Contract during the period August to October 2004, Drake's Vice President of Motor Fuels & Market Development, Peter R. Potter, Jr. ("Mr. Potter"), assured her that neither the rent she would be paying after January 1, 2005 as a result of the September 15 letter nor the rent she would pay under a new Lease would be higher than she was currently paying because Drake has been collecting the higher rent *all along* in the form of prices for gasoline on average five cents higher than it agreed to charge under the 1993, 1997 and 2000 PMPA Franchise Agreements.

29.     Mr. Potter has repeatedly admitted to Ms. Amaral that Drake had been collecting what it felt was the appropriate rent for the Station by recapturing the five cents per gallon rent credit it has been extending to Ms. Amaral since August 1995 under the Rent Reduction Letter in the form of higher gasoline prices.

30.     As a result, the actual rent Drake has collected from Ms. Amaral since August 1995 has been, on average, approximately $5,000 per month more than it represented to be her rent obligation, as stated in its Rent Calculation Worksheets and as drafted from her bank account each month. Without giving Ms. Amaral ninety days' notice that it was withdrawing the five cents per gallon rent rebate as required under the Rent Reduction Letter and Article III, Paragraph E of the 1993 PMPA Franchise Agreement, Drake simply made up for the lost rental revenue by tacking an extra five cents per gallon on to the prices it charged her for motor fuel.

31.     As a result of such practice, Ms. Amaral has been forced to pay Drake far more per gallon for motor fuel than other dealers, and consistently more than she would have been required to pay per gallon had she been purchasing motor fuel directly from Mobil. Because their cost of product is lower, competing gasoline stations, including a nearby XtraMart station supplied by Drake and operated by Drake's employees, agents, licensees or affiliated company, have been able to charge, and have routinely charged, retail prices for gasoline just pennies above, and in some cases at or below, Ms. Amaral's *cost*, thus placing her at a severe competitive disadvantage, and depressing gasoline and convenience store sales at the Station.

32.     By letter dated October 7, 2004, Ms. Amaral (a) objected to the withdrawal by Drake of the $1,500.00 24-hour rent credit and to the reduction of the five cent per gallon credit to two cents; (b) advised Drake that the rents proposed in the March Lease were higher than other dealers were paying, and more than she could afford to pay, especially given the high prices Drake was charging her for motor fuel, which were not allowing her to be competitive,

9

and (c) requested that Drake state in writing what it had previously stated orally during contract negotiations it was proposing to charge in rent and for motor fuel. A true and correct copy of the October 7th letter is attached as **Exhibit J.**

33.    On November 18, 2004, Ms. Amaral received from Drake a new Lease and Dealer Sales Contract, true and correct copies of which are attached as **Exhibits K** ("November Lease") and **L** ("November Dealer Sales Contract"), respectively.

34.    The November Lease contains the same terms as the March Lease except that (a) Annual Base Rents are reduced approximately $2,000 per month from those specified in the March Lease (November Lease, ¶3 (a)-(c)); (b) Ms. Amaral's liability for real estate taxes is reduced from 100% to 50% (Id., ¶6); and (c) the amount of the security deposit is now set at $25,000.00. Id., ¶37.

35.    The November Dealer Sales Contract contains the same terms as the March Dealer Sales Contract with the following exceptions:

   a.    The blanks in Paragraph 3 of the March Dealer Sales Contract have been filled in so as to not only increase Ms. Amaral's contract minimum by 31% from 1,143,100 under the 2000 PMPA Franchise Agreement to 1,500,000 gallons of motor fuel per year, but require her to pay Drake a five cents per gallon surcharge for each gallon by which purchases fell short of the minimum. November Dealer Sales Contract, ¶3;

   b.    The pricing provision (¶4) has been changed. Where the March Dealer Sales Contract set prices for motor fuel at Drake's "established dealer tankwagon price for [Drake]'s dealers for the respective grades of products delivered in effect at the time and for the place of delivery," the November Dealer Sales Contract sets prices for motor fuel at Drake's "rack price" from Mobil plus five cents per gallon;

   c.    The payment terms (¶6) have been changed. Where the March Dealer Sales Contract requires payment "in cash or by certified or bank cashier's check upon delivery," the November Dealer Sales Contract requires payment via Electronic Funds Transfer. Id., ¶6; and

       d.    A new paragraph (¶29) has been added providing, in the event Ms. Amaral's gasoline purchases exceeded her 125,000 gallon monthly minimum purchase obligation under Paragraph 3, that:

            i.    In year one, Drake would reduce by three (3) cents the price charged for gallons 125,001 to 150,000, and by four (4) cents the prices charged for gallons 150,001 and above; and

            ii.    In years two and three, Drake would reduce by four (4) cents the prices charged for gallons 125,001 to 150,000, and by three (3) cents per gallon the prices charged for gallons 150,001 and above.

36.    In 2003, the Station purchased 1.2 million gallons of motor fuel from Drake.

37.    Purchases by the Station for 2004 are expected to drop to 1.1 million gallons of motor fuel.

38.    In no year since Ms. Amaral began operating the Station has she purchased more than 1.2 million gallons of motor fuel. In only one month (August 2003) have purchases in any month during the last two calendar years come close (124,900) to the 125,000 gallons per month Ms. Amaral would be required to purchase every month under the November Dealer Sales Contract to meet the minimum purchase requirement, qualify for the volume incentive rebates, and avoid immediate termination for failure to meet the monthly minimum.

39.    By establishing a 1.5 million gallon minimum purchase requirement under Paragraph 3 of the November Dealer Sales Contract that bears no relationship to the Station's historical purchases, Drake will thus not only guarantee to itself payment, over and above rent, of least an additional $15,000 per year (300,000 gallons times $.05 per gallon), but, more importantly, the right to immediately terminate the Dealer Sales Contract when Ms. Amaral inevitably fails to meet the minimum monthly purchase requirement.

40.    While Ms. Amaral's obligation under Paragraph 6 of the November Lease to pay 50% of the $17,000 real estate taxes represents half of the tax obligation proposed under Paragraph 6 of the March Lease, it is 50% more than Drake offered during contract negotiations.

11

Because Ms. Amaral was not obligated to pay any real estate taxes under the 1993, 1997 and 2000 PMPA Franchise Agreements, the November Lease will increase Ms. Amaral's operating expenses by $8,500 per year.

41.     Taken together, the likely gallonage surcharge of at least $15,000 per year and the new real estate tax liability of $8,500 per year would approximately offset the apparent $2,000 per month rent reductions in the November Lease from those stated in the March Lease.

42.     In addition to the bad faith, unfair and/or deceptive conduct alleged in paragraphs 13 to 40, Drake has engaged in a pervasive pattern of unfair and/or deceptive conduct towards Ms. Amaral, including but not limited to:

   a. presenting Ms. Amaral with a new contract fifteen months after expiration of the 2000 PMPA Franchise Agreement;

   b. failing to negotiate in good faith over the terms of a new contract;

   c. proposing a Lease and Dealer Sales Contract (i) seeking to impose numerous unfair and/or deceptive terms on Ms. Amaral; (ii) stating terms less favorable and/or different from those stated orally; and (iii) which would require Ms. Amaral to waive numerous substantive and procedural rights granted franchisees under the PMPA and state law;

   d. threatening to terminate her franchise in order to replace her with a more "aggressive" dealer;

   e. threatening, if she objected to Drake's management about the high rents being proposed in the Lease, to charge her even higher rents;

   f. threatening to and selling motor fuel at a nearby XtraMart station at prices near or below Ms. Amaral's cost;

   g. thwarting possible sale of her franchise by indicating to her that she had nothing to sell because she did not have a contract;

   h. threatening to convert the Marketing Premises to another use, such as a CVS or Rite-Aid Pharmacy, if she did not sign the Lease and Dealer Contract as presented;

12

i.    suggesting that she give up her franchise and begin posing for
pornographic photographs because she could make more money doing so
than she was making from operating the Station;

j.    charging her prices for motor fuel on average five cents more per gallon
than she was required to pay under the 1993, 1997 and 1999 Franchise
Agreements as additional rent while falsely representing that the Rent
Calculation Worksheets stated the full amount of her rent obligations;

k.    Consistently charging commercially unreasonable prices for motor fuel,
placing the Station at a severe disadvantage in competing against other
gasoline stations in the Fall River/Dartmouth/New Bedford market, and
depressing motor fuel and convenience store sales as well as the value of
her franchise in the market for the sale of gasoline service station
franchises; and

l.    Threatening to not only withdraw the $1,500 24-hour rent rebate and
reduce the per gallon rent rebate from $.05 to $.02 under the September
15, 2004 letter but to continue to charge her an extra $.05 per gallon for
motor fuel if she did not sign a new Lease and Dealer Sales Contract
substantially in the form presented.

43.    Drake has engaged in such unfair and/or deceptive conduct with the purpose and
intent of driving Ms. Amaral out of business.

## COUNT I

### (Breach of Contract)

44.    Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the
allegations of paragraphs 1 to 43 above.

45.    By charging Ms. Amaral more per gallon for motor fuel than the prices in effect at
the time and place of delivery for that class of customer in which she then fell, and/or by
collecting monthly rent in excess of the amounts Ms. Amaral was contractually obligated to pay,
Drake has committed knowing and material breaches of the 1993, 1997, and 2000 PMPA
Franchise Agreements.

46.    Ms. Amaral has suffered substantial damages as a result of Drake's material
breaches of contract.

13



## COUNT II

### (Breach of Implied Covenant Of
### Good Faith and Fair Dealing)

47.     Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 46 above.

48.     Drake's actions have had, and continue to have, the effect of destroying or injuring the right of Ms. Amaral to receive the benefits of the 1993, 1997, and 2000 PMPA Franchise Agreements and her franchise (including without limitation the rent reductions specified in the Rent Reduction Letter and the prices for motor fuel specified in such agreements) in violation of the covenant of good faith and fair dealing implied in such agreements.

49.     As a direct and proximate result of Drake's breach of the implied covenant of good faith and fair dealing, Ms. Amaral has suffered substantial damages.

## COUNT III

### (Fraudulent Misrepresentation)

50.     Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 49 above.

51.     Drake has deposited in the United States mails on a monthly basis Rent Calculation Worksheets addressed to Ms. Amaral falsely stating an amount in net rent less than the actual amount of rent collected by Drake.

52.     Since September 1995, Drake has collected monies via electronic funds transfer from Ms. Amaral's business checking account in excess of the net amount she owed in rent under the Rent Calculation Worksheets and the rent and pricing provisions of the 1993, 1997 and 2000 PMPA Franchise Agreements.

53.     Drake's misrepresentations regarding the amount of rent charged Ms. Amaral were made with the actual intent to deceive Ms. Amaral.

54.     Ms. Amaral reasonably relied to her detriment upon Drake's misrepresentations.

## COUNT V

### (M.G.L. c.93A, §11)

55.     Ms. Amaral incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 54 above.

56.     At all relevant times, Ms. Amaral and Drake have been engaged in the conduct of trade or commerce.

57.     The actions of Drake constitute unfair and/or deceptive acts or practices and willful and knowing violations of M.G.L. c.93A, §11.

58.     Ms. Amaral has suffered a loss of money or property as a direct and proximate result of Drake's unfair and/or deceptive acts or practices.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiff Marnie J. Amaral requests that this Court:

A.      Issue a preliminary injunction and thereafter a permanent injunction ordering Drake Petroleum Company, Inc. and its respective officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, to:

> (1)     Continue providing Ms. Amaral a $1,500 rent rebate for operating the Station 24 hours per day and a volume rent credit of $.05 per gallon from gallon one;

> (2)     Continue providing Ms. Amaral monthly Rent Calculation Worksheets reflecting deductions of the $1,500 24-hour rent

15

rebate, the $.05 per gallon rent credit, the amount collected under the gallonage collection program and the net rent to be drafted from her account on the fifteenth day of the following month;

(3)     Draft from Ms. Amaral's account, in full satisfaction of her rent obligation, only the net rent specified on the monthly Rent Calculation Worksheets;

(4)     Charge Ms. Amaral those prices for motor fuel as are then in effect at time and place of delivery for that class of customer in which she shall then fall, as required under Article II (B) of the 1993 PMPA Franchise Agreement, or Drake's established dealer tankwagon price for Drake's dealers for the respective grades of product delivered in effect at the time and for the place of delivery, whichever is lower;

(5)     Provide to Ms. Amaral's counsel coincident with the issuance of invoices to Ms. Amaral for motor fuel such document(s) as will establish that the prices reflected on such invoices are equal to those charged to customers in the same class as Ms. Amaral and to Drake's established dealer tankwagon price for its dealers;

(6)     Negotiate in good faith over the terms of a new franchise agreement and thereafter present to Ms. Amaral a Lease and Dealer Sales Contract which continue the franchise and franchise relationship between the parties within the meaning the meaning of Section 2801(1)(A), (B)(i), (ii) and (2) of the PMPA and do not

16

require Ms. Amaral to waive any substantive or procedural right

granted franchisees under the PMPA and state law.

B.   Enter judgment declaring that Drake has committed material breaches of the 1993, 1997 and 2000 PMPA Franchise Agreements;

C.   Enter judgment declaring that Drake has breached the covenants of good faith and fair dealing implied in the 1993, 1997 and 2000 PMPA Franchise Agreements;

D.   Enter judgment declaring that Drake has engaged in unfair and/or deceptive trade practices in willful and knowing violation of M.G.L. c.93A, §11;

E.   Award Ms. Amaral the actual damages she has suffered as a result of Drake's material breaches of the 1993, 1997 and 2000 PMPA Franchise Agreements;

F.   Award Ms. Amaral the actual damages she has suffered as a result of Drake's material breaches of the covenants of good faith and fair dealing implied in the 1993, 1997 and 2000 PMPA Franchise Agreements;

G.   Award Ms. Amaral three times the actual damages she has suffered as a result of Drake's willful and knowing violations of M.G.L. c.93A, §11, plus reasonable attorney's fees;

H.   Award Ms. Amaral the costs of this action; and

I.   Grant such other different and further relief as the Court deems appropriate.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES
THAT ARE TRIABLE BY JURY AS A MATTER OF RIGHT

MARNIE J. AMARAL
By her attorney,

*Lindsey M. S*

Lindsey Marie Straus, Esquire
BBO #554181
Law Office of Lindsey M. Straus
1583 Main Street
Brewster, MA 02631
(508) 896-8008

Dated: December 7, 2004

18